**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

JOHN LEE CONAWAY,
            *Petitioner-Appellant,*

v.

MARVIN POLK, Warden, Central
Prison, Raleigh, North Carolina;
NORTH CAROLINA ATTORNEY
GENERAL,

            *Respondents-Appellees.*

No. 04-20

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
James A. Beaty, Jr., District Judge.
(CA-98-1117-1)

Argued: October 25, 2005

Decided: July 11, 2006

Before WIDENER, KING, and DUNCAN, Circuit Judges.

---

Affirmed in part and remanded in part by published opinion. Judge
King wrote the opinion, in which Judge Duncan joined. Judge Widener wrote a concurring opinion.

---

## COUNSEL

**ARGUED:** Burton Craige, PATTERSON HARKAVY, L.L.P.,
Raleigh, North Carolina, for Appellant. Valerie Blanche Spalding,
NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North

Carolina, for Appellees. **ON BRIEF:** F. Marsh Smith, Southern Pines, North Carolina; Matthew Stiegler, CENTER FOR DEATH PENALTY LITIGATION, Durham, North Carolina, for Appellant. Roy Cooper, Attorney General of North Carolina, Raleigh, North Carolina, for Appellees.

## OPINION

KING, Circuit Judge:

John Lee Conaway appeals from the dismissal of his petition for federal habeas corpus relief with respect to his North Carolina convictions and sentences, including his two death sentences. On April 1, 2005, we granted Conaway a certificate of appealability (the "COA") on the two claims he raises on appeal: (1) that his Sixth Amendment right to an impartial jury was contravened because a trial juror concealed a close familial relationship to a co-defendant who was also a key prosecution witness (the "Juror Bias claim"); and (2) that, because Conaway is mentally retarded, his execution is precluded by the Eighth Amendment, as enunciated in *Atkins v. Virginia*, 536 U.S. 304 (2002) (the "*Atkins* claim"). After unsuccessfully pursuing these and other claims in state court, Conaway filed his federal habeas corpus petition in the Middle District of North Carolina, where he sought an evidentiary hearing to prove his underlying allegations. In January 2004, the district court denied Conaway's request for a hearing and dismissed the petition. *Conaway v. French*, No. 98-1117 (M.D.N.C. Jan. 23, 2004).

As explained below, the state court's rejection of the Juror Bias claim involved an unreasonable application of clearly established federal law as determined by the Supreme Court, and Conaway's allegations entitle him to an evidentiary hearing. We therefore remand to the district court for an evidentiary hearing on the Juror Bias claim, and we affirm the court's dismissal of the *Atkins* claim.

I.

A.

Conaway was convicted in the Superior Court of Richmond County, North Carolina, on October 15, 1992, of the first-degree mur-

ders of Thomas Weatherford and Paul Callahan, and of several related offenses. In its opinion denying Conaway relief in his direct appeal, *State v. Conaway*, 453 S.E.2d 824 (N.C. 1995), the Supreme Court of North Carolina summarized the facts underlying Conaway's conviction, in part, as follows:

> On the evening of 22 August 1991, Thomas Amos Weatherford and Paul DeWitt Callahan were in the Pantry store located on Highway 177 South in Hamlet, North Carolina. Weatherford was working as the night-shift clerk. Callahan, his roommate, had driven Weatherford to work at 11:00 p.m. and stayed at the store with him for several hours that night.

***

> The evidence showed that [on the night of August 22, 1991, Conaway, along with Kelly Harrington, Michael McKinnon, and Kevin "Keith" Scott] began to walk around the streets of Hamlet. [Conaway] started looking for a car he could steal to drive back to Washington, D.C. . . .

> Sometime between 1:30 a.m. and 1:45 a.m. on 23 August 1991, the four men went to the Pantry . . . . [Conaway] told the other men to wait outside while he went into the store to get more beer. While inside the Pantry, [Conaway] stole $78.00 from the cash register and kidnapped Weatherford and Callahan at gunpoint.

> McKinnon, Harrington, and Scott all testified at trial that several minutes after [Conaway] left them to go into the Pantry, he drove up in a dark-colored car. This car was later identified as belonging to Callahan. The two victims were in the front seat of the car with [Conaway], who was pointing a gun at them. [Conaway] told McKinnon, Harrington, and Scott to get into the car. The three men got into the backseat of the car, and [Conaway] drove away from the Pantry. . . .

***

[According to McKinnon, Harrington, and Scott,] [a]fter [Conaway] passed the Coca-Cola plant on Highway 74, he stopped the car on the side of the road in an isolated area and . . . ordered [Weatherford and Callahan] to get out of the car. McKinnon, Harrington, and Scott remained in the car, while [Conaway] walked the victims into the woods. McKinnon, Harrington, and Scott were unable to see [Conaway] once he entered the woods, but they heard two gunshots fired several seconds apart. . . . [The four men then drove together to Washington, D.C.]

\*\*\*

On 29 August 1991, Army Sergeant Daniel Poe was flying his ultralight plane near Hamlet looking for his lost dog. He was flying at a height of approximately five hundred feet over Highway 74 when he noticed something white on the ground in the woods. Poe took a closer look and saw the victims' bodies lying on the ground in the woods about eighty-seven feet from Highway 74. . . .

\*\*\*

[Conaway, Harrington, McKinnon, and Scott] arrived in Washington, D.C., around 8:00 a.m. on 23 August 1991. [Conaway] visited with his brother and stepfather that afternoon. . . . Late that afternoon, [Conaway] went to Cambridge, Maryland, to visit two friends and to see his mother.

McKinnon, Harrington, and Scott stayed with [Conaway]'s brother and with Harrington's cousin Darlene for two nights and then went to Maryland to stay with Harrington's brother. The three men returned to Hamlet on or about 30 August 1991 and confessed their participation in these murders to the Hamlet police.

On 25 August 1991, while standing on the street talking to a friend from prison, [Conaway] was arrested in Cambridge, Maryland. . . . When [Conaway] was searched, a

.25-caliber handgun and six .25-caliber rounds of ammuni-
tion were found in his possession.

*Conaway*, 453 S.E.2d at 831-33.[1]

On September 30, 1991, Conaway was indicted in Richmond
County on two charges of first-degree murder for the deaths of Calla-
han and Weatherford, and he was returned to North Carolina from
Maryland on February 25, 1992. In early March 1992, Conaway was
further indicted for first-degree kidnapping, robbery with a dangerous
weapon, and larceny, arising from the circumstances surrounding the
deaths of Weatherford and Callahan. Harrington, McKinnon, and
Scott (the "co-defendants") were also indicted in Richmond County
on charges of first-degree murder, kidnapping, robbery, and larceny.
The co-defendants each testified against Conaway, who the prosecu-
tion (the "State") tried alone. After Conaway was convicted, the State
dropped the murder charges against the co-defendants, each of whom
pleaded guilty to first-degree kidnapping and received a twenty-five
year sentence.[2]

B.

1.

In October 1992, Conaway was tried for first-degree murder and
the related offenses in the Superior Court of Richmond County. From

---

[1]At trial, the evidence showed that Conaway had been arrested in
Maryland on unrelated charges prior to the discovery in North Carolina
of the bodies of Weatherford and Callahan. *Conaway*, 453 S.E.2d at 833.
At the time of his arrest, Maryland authorities found a key on Conaway
that was determined to belong to Weatherford and Callahan. *Id.* at 834.
Boyd Bostic, a convicted forger, testified for the prosecution that Con-
away had implicated himself while they were housed together in the
Richmond County Jail in May 1992. *Id.* At trial, Conaway denied any
responsibility for the murders and asserted that he had never spoken to
Bostic. *Id.* at 834-36.

[2]According to records of the North Carolina Department of Correc-
tions, Scott was released from custody in 2000, McKinnon in 2001, and
Harrington in 2002.

October 6, 1992, to October 9, 1992, voir dire was conducted of the prospective jurors in the venire.[3] Among the prospective jurors was a man named Rannie Waddell, Jr. ("Juror Waddell"), who Conaway alleges was a double first cousin, once removed, of co-defendant Harrington, a key prosecution witness.[4]

On the first day of the jury selection proceedings, and with the venire present, the prosecutor read a list of twenty-six witnesses expected to testify for the State, including co-defendant Harrington. The prosecutor then asked various potential jurors if they "kn[e]w" any of the witnesses or "recognize[d]" any of the names. *See, e.g.*, J.A. 187.[5] That day, three members of the venire were excused for cause because they knew various witnesses, including one who explained that co-defendant Scott was her cousin. *See, e.g.*, *id.* at 188.

On the afternoon of October 7, 1992, the second day of the jury

---

[3]The Latin word "venire" refers to the panel of citizens from which the jury for a particular trial is selected, and includes those persons not qualified or not selected for jury service. *Black's Law Dictionary* 1590 (8th ed. 2004). The French term "voir dire" refers to the examination which the trial court and the lawyers make of prospective jurors in the venire concerning their suitability to serve as jurors. *Id.* at 1605.

[4]Conaway maintains that Juror Waddell and co-defendant Harrington are "double first cousins, once removed." Appellant's Br. at 4. The term "double first cousins" is generally used to refer to persons related in the following manner: "When two brothers marry two sisters, the children of these two unions are known as double cousins." Vance Randolph, *A Fourth Ozark Word List*, American Speech, Feb. 1933, at 47, 48. Double first cousins have their four grandparents in common. *See id.* The term "once removed" indicates that the related parties are separated by a single generation. *See Webster's Third New International Dictionary* 1921 (1976). Double first cousins, once removed, have the same biological relationship as an uncle and his nephew. The facts alleged by Conaway are that co-defendant Harrington's father and Juror Waddell share three of their four grandparents. In any event, we use Conaway's characterization of the relationship — "double first cousins, once removed" — to describe the alleged relationship between Juror Waddell and co-defendant Harrington.

[5]Citations to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

selection proceedings, the prosecutor asked Juror Waddell if he knew any of the individuals who had repeatedly been identified as potential State witnesses. J.A. 444. Juror Waddell acknowledged that he was familiar with the witness list and that he knew one potential witness, Sheriff Sam Jarrell. *Id.* Juror Waddell did not, however, acknowledge knowing or being related to co-defendant Harrington. The prosecutor asked Juror Waddell whether he, any close friend, or any family member "had any dealings with the District Attorney's Office," and Waddell responded, "No." *Id.* at 445. The prosecutor further inquired whether Juror Waddell had formed an opinion about the case, and he again responded in the negative. *Id.* at 446. When the prosecutor asked whether there was "any reason whatsoever, whether I've asked you or not that you could think of that would keep you from being fair and impartial in this case," Juror Waddell answered, "No, sir." *Id.* Juror Waddell acknowledged that he had read about the case in a newspaper approximately a year earlier, but when Conaway's lawyer asked if Juror Waddell had talked about the case with any family members or friends, or had heard anyone else discussing the matter, he asserted that he had not. *Id.* at 457-58. Later that day, while Juror Waddell was yet present, several other prospective jurors were asked whether they recognized any of the co-defendants, including Harrington. Juror Waddell remained silent, and he was ultimately selected to serve on the jury.

On Saturday, October 10, 1992, after the jury had been selected, but before it was impaneled, Conaway's lawyer received an anonymous phone call at his office. J.A. 1101f. The caller advised the lawyer's secretary that Juror Waddell was Harrington's cousin, "may be even [his] first cousin." *Id.*

2.

The two-day guilt phase of Conaway's trial began on Monday, October 12, 1992, after the jury was impaneled and sworn. Later that day, Harrington testified for the State and denied any responsibility for the murders of Weatherford and Callahan. He acknowledged that he faced the same charges as Conaway, but maintained that the State had not offered to reduce the charges against him, or made other promises to him in exchange for his testimony. J.A. 989-90. Harrington admitted that, after the murders of Weatherford and Callahan, he

had spent several days in the Washington, D.C. area with McKinnon and Scott, and that the three co-defendants had discussed "what [they were] going to say" about the murders. *Id.* at 988. According to Harrington, they considered blaming the murders on a fictitious man named "Bro," but later decided to "tell the truth" and implicate Conaway. *Id.* Harrington testified that, although he had grown up with co-defendants Scott and McKinnon, he had met Conaway less than two months before the murders. *Id.* at 949-50.[6] Harrington asserted that he decided to testify against Conaway because it was "the right thing for me to do," but he acknowledged that by so doing, he was "defending [him]self." *Id.* at 989-90.

After the State rested its case, Conaway took the stand in his own defense. Conaway testified that, on the night of August 22, 1991, in Hamlet, North Carolina, he loaned his grandmother's handgun to Harrington. *Conaway*, 453 S.E.2d at 835. Conaway then went alone to his girlfriend's apartment in Hamlet, where the couple had an argument and Conaway soon departed. *Id.* Conaway did not see the co-defendants again until they picked him up the next morning. *Id.* Harrington returned the handgun to Conaway while the four men were driving together from North Carolina to Washington, D.C. *Id.* Conaway maintained that he did not learn about the murders of Weatherford and Callahan until after his Maryland arrest, and he denied any knowledge of, or responsibility for, the crimes. *Id.* at 834.

The trial evidence essentially presented the jury with a swearing contest between Conaway, on one side, and his co-defendants, including Harrington, on the other. Indeed, in closing argument, the prosecutor told the jury that "if you believe what Kelly Harrington told you . . . [y]ou can convict Mr. Conaway of all the charges. If you believe Mr. Conaway . . . then you will acquit Mr. Conaway. It's really simple." J.A. 1082. On October 15, 1992, the jury returned guilty verdicts against Conaway on all charges: two for first-degree murder, two for kidnapping, a single charge of robbery with a dangerous weapon, and one larceny offense. The court then recessed until the following Mon-

---

[6]Co-defendants Harrington, McKinnon and Scott all grew up together around Hamlet, North Carolina. Conaway spent most of his youth in the Washington, D.C. area.

day, October 19, 1992, when the sentencing phase of the trial was to begin.

3.

When the proceedings resumed on October 19, 1992, Conaway's lawyer, Benny Sharpe, informed the court of the anonymous phone call received by his office on Saturday, October 10, 1992, which had advised that Juror Waddell was "a cousin, and may be even a first cousin of the co-defendant, Kelly Harrington." J.A. 1101f. Sharpe explained to the court that "[w]e don't have anything to substantiate this [information] at this time, and we don't know where the anonymous caller got this information, but we felt we needed to bring this to the attention" of the court. *Id.* at 1101f-1101g. Sharpe requested that the court question Juror Waddell to ascertain his kinship, if any, to co-defendant Harrington. *Id.* Sharpe also sought to have the court examine a transcript of the voir dire proceedings and review Juror Waddell's answers to the questions concerning Waddell's "relationship or knowledge of the incident, or people involved." *Id.* at 1101g. The court inquired whether Conaway's lawyer had found any "authority requiring" a hearing because of an anonymous phone call, and Sharpe responded that he had not yet checked. *Id.* The court then denied all of the defense motions. *Id.* at 1101h. The court did not inquire about the apparent nine-day delay in bringing the phone call to its attention, and no explanation was offered.[7]

At the sentencing hearing, Conaway's lawyers presented the testimony of two witnesses: Cynthia McRae, his cousin, and Dr. Brad Fisher, a forensic psychologist who had interviewed Conaway and his family and reviewed his records. Dr. Fisher testified that Conaway was "disturbed" due to childhood abuse and neglect, and that he had abused alcohol and drugs since the age of ten. J.A. 1106-09. On cross-

---

[7]At trial, Conaway was represented by Sharpe and attorney Kelly Williams of Rockingham, North Carolina. In his direct appeal, Conaway was represented by Fred DeVore of Charlotte, North Carolina. In his post-conviction proceedings in North Carolina, he was represented by Marsh Smith and Sue Berry of Southern Pines, North Carolina. In these proceedings, Conaway is represented by Smith, Burton Craige of Raleigh, North Carolina, and Matthew Stiegler of Durham, North Carolina.

examination, Dr. Fisher opined that Conaway was not mentally retarded. *Id.* at 1120-21. He explained that, because Conaway had scored 79 on an intelligence quotient ("IQ") test in 1977, and scored 80 on a second IQ test in 1982, his IQ scores were above the range for mental retardation (which is generally defined as an IQ score of 70 or below). *Id.* For its part, the State presented the jury with the results of pretrial tests indicating that Conaway's "intellectual functioning falls within the average range of cognitive abilities." J.A. 1725.

On the evening of October 19, 1992, at the conclusion of the trial's one-day sentencing phase, the jury returned its sentencing verdicts, recommending that Conaway be sentenced to death on each of the murder convictions. The trial court accepted the jury's recommendations and forthwith imposed two death sentences on Conaway. The court also sentenced Conaway to forty years in prison on each of the two kidnapping convictions, forty years for robbery with a dangerous weapon, and two years on the larceny conviction, to run concurrently with each other, beginning at the expiration of his death sentences. *State v. Conaway*, No. 91 CRS 1721-24 (N.C. Super. Ct. Oct. 19, 1992) (felony judgment).

Conaway thereafter appealed his convictions and sentences to the Supreme Court of North Carolina, contending, inter alia, that the denial of his motions concerning Juror Waddell's alleged relationship to co-defendant Harrington had deprived Conaway of his constitutional right to trial before an impartial jury. By its opinion of February 10, 1995, the Supreme Court of North Carolina denied Conaway's appellate claims. *Conaway*, 453 S.E.2d at 831. On the Juror Bias claim, the court concluded that the trial court had not erred in refusing to question Juror Waddell, given Conaway's "critical delay in bringing this alleged telephone call to the trial court's attention and the lack of evidence to substantiate this alleged anonymous telephone call." *Id.* at 844. The Supreme Court of the United States thereafter denied certiorari. *Conaway v. North Carolina*, 516 U.S. 884 (1995).

4.

On July 22, 1996, Sue Berry and Marsh Smith were appointed as Conaway's state post-conviction counsel by the Superior Court of

Richmond County. On October 23, 1996, Conaway filed a motion in Superior Court seeking funds to hire an investigator to assist counsel on a motion for appropriate relief (an "MAR").[8] After the motion for funds was denied on December 2, 1996, Conaway filed an MAR in the Superior Court of Richmond County (the "MAR Court") on January 8, 1997, asserting claims not at issue here.

Meanwhile, Conaway's lawyers continued their efforts to substantiate the allegation that co-defendant Harrington and Juror Waddell were related.[9] On March 20, 1997, Conaway's lawyer, Berry, interviewed Harrington in a North Carolina prison. According to affidavits later filed by Berry, Harrington was "wary and guarded" and "not particularly knowledgeable of his forebears," but nonetheless confirmed that he was related to Juror Waddell. J.A. 1553; J.A. 1575. Harrington provided Berry with his father's phone number. J.A. 1575. Berry also sought unsuccessfully to contact Juror Waddell by calling his home several times in early 1997. On May 13, 1997, Berry called the home and spoke to a man identifying himself as Juror Waddell's son, who informed Berry that Juror Waddell had recently passed away. *Id.* at 1576. On June 4, 1997, Berry spoke by telephone with co-defendant Harrington's father, Theodore Roosevelt "Johnny" Harrington, who was "curt and somewhat hostile," but nonetheless confirmed that he was a "double first cousin to Juror Waddell, in that brothers married sisters." *Id.* Johnny Harrington also informed Berry that he was aware that Juror Waddell had passed away. J.A. 1553.

---

[8]A defendant convicted of a crime in North Carolina may seek post-conviction relief by way of an MAR. An MAR is not identical to a habeas corpus petition, but it provides an avenue to obtain relief from "errors committed in criminal trials." *See* N.C. Gen. Stat. § 15A-1401.

[9]In presenting the facts, we accept the well-pleaded allegations in Conaway's petition for habeas corpus relief as being true, and we draw all reasonable factual inferences in Conaway's favor. *See Walker v. True*, 399 F.3d 315, 319 (4th Cir. 2005) (observing that habeas court was obliged to assess petition using standards for motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)); *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) (stating that, in addressing Rule 12(b)(6) motion, court must accept all well-pleaded allegations as true, and draw all reasonable factual inferences in plaintiff's favor).

On June 25, 1997, Conaway filed an amended MAR, raising the Juror Bias claim in the MAR Court for the first time. By that claim, Conaway contended that he had been denied his right to a "fair and impartial jury" under both the federal and state constitutions due to "juror misconduct" on the part of Juror Waddell. J.A. 1440. On September 23, 1997, Conaway requested that the MAR Court conduct an evidentiary hearing on several issues, including the Juror Bias claim.

On November 6, 1997, Conaway filed a second amended MAR ("MAR I"), incorporating his previous MARs and particularizing the Juror Bias claim. In that regard, Conaway contended that his constitutional right to an impartial jury had been contravened because: (1) Juror Waddell was "presumptively biased" against Conaway due to Juror Waddell's "familial relation" to co-defendant Harrington; (2) Juror Waddell was excusable for cause from the jury; and (3) Juror Waddell was "untruthful" during the voir dire proceedings. J.A. 1466-69. Conaway asserted that the "trial jury could not factually accept Kelly Harrington's testimony and that of [Conaway]," and that "[d]isbelieving Kelly Harrington's testimony would have meant believing that he was the trigger man or with the trigger man and not merely present at the scene of a crime." *Id.* at 1469. MAR I was supported by an affidavit of attorney Berry, stating that Juror Waddell was a "double first cousin to the father of Kelly Harrington," and spelling out the facts surrounding the anonymous phone call received by the trial lawyer's office. J.A. 1476.

On January 22, 1998, the MAR Court denied MAR I on the pleadings, without conducting an evidentiary hearing. *State v. Conaway*, No. 91 CRS 5877-5878, slip op. at 11 (N.C. Super. Ct. Jan. 22, 1998). In rejecting the Juror Bias claim, the MAR Court ruled that the alleged relationship between Juror Waddell and Harrington, if substantiated, would not contravene either the state or federal constitution. *Id.* The MAR Court remarked that Conaway had failed to support his claim with affidavits or documentary evidence that Harrington was, in fact, related to Juror Waddell. *Id.*[10] Conaway peti-

---

[10]In denying MAR I, the MAR Court observed that the Juror Bias claim was procedurally barred "in that [Conaway] could have raised this on direct appeal and failed to do so." *State v. Conaway*, No. 91 CRS 5877-5878, slip op. at 11 (N.C. Super. Ct. Jan. 22, 1998). The Juror Bias claim was, in fact, the first contention addressed and rejected by the Supreme Court of North Carolina in Conaway's direct appeal. *See State v. Conaway*, 453 S.E.2d 824, 843 (N.C. 1995).

tioned the Supreme Court of North Carolina for a writ of certiorari on the MAR I ruling, but his petition was denied on November 5, 1998. *State v. Conaway*, 525 S.E.2d 181 (N.C. 1998).

5.

a.

On December 31, 1998, Conaway filed a petition for federal habeas corpus relief in the Middle District of North Carolina asserting, inter alia, the Juror Bias claim, and requesting an evidentiary hearing in federal court. By his petition, Conaway alleged: (1) that Juror Waddell was a double first cousin to co-defendant Harrington's father, *see* Pet. ¶ 82; (2) that Juror Waddell did not disclose the familial relationship on voir dire, *see id.*; (3) that Kelly Harrington was a co-defendant whose testimony for the State exculpated Harrington by implicating Conaway, *see id.* at ¶ 83-84; and (4) that Juror Waddell was subject to challenge for cause based on his relationship to co-defendant Harrington, *see id.* at ¶ 85-86. In making these allegations, Conaway incorporated by reference the transcript of the voir dire proceedings at his trial, as well as the affidavit of Berry, filed in support of MAR I, stating that Juror Waddell and co-defendant Harrington were double first cousins, once removed. *See id.* at ¶ 82.

b.

On July 9, 1999, Conaway filed a motion in the district court seeking funds to hire an investigator to assist counsel on the Juror Bias claim. The motion was supported by another affidavit of lawyer Berry, stating that she had spoken in person with Kelly Harrington and by telephone with Harrington's father, each of whom confirmed their "family relationship" with Juror Waddell. J.A. 1553. On March 8, 2000, the federal magistrate judge declined to authorize the hiring of an investigator, ruling that Conaway had failed to allege facts that would entitle him to relief, and that his allegations were speculative. *Conaway v. French*, No. 98-1117, slip op. at 2 (M.D.N.C. Mar. 8, 2000).

On April 4, 2000, Conaway filed a motion for funds to hire a gene-

alogy expert to assist in establishing the familial relationship between Harrington and Juror Waddell or, alternatively, for authorization, pursuant to the applicable rules of procedure, to supplement the record with affidavits. *See* 28 U.S.C. foll. § 2254. The motion was supported by the affidavit of Juror Waddell's son, Michael Waddell, who stated that he had lived with Juror Waddell during Conaway's trial, and that Juror Waddell knew, prior to serving on the jury, that co-defendant Harrington was the son of Juror Waddell's first cousin. J.A. 1564. In further support of this motion, Conaway submitted the affidavit of his lawyer Marsh Smith, setting forth, inter alia, his conversations with Juror Waddell's daughter, Celia Waddell. By his affidavit, Smith stated that he had spoken with Ms. Waddell by telephone several times in 2000. J.A. 1568-69. Smith explained that he had prepared a draft affidavit for her on the basis of her statements to him, that he read the draft affidavit to her by phone, and that he revised its contents according to her requests. *Id.*[11] After Ms. Waddell consulted with her own attorney (to whom Smith referred her), she refused to execute the affidavit or return Smith's phone calls. *Id.* at 1569. Smith incorporated Ms. Waddell's draft affidavit into his own affidavit, specifying therein the evidence that she would present if called to testify.

According to Smith's affidavit, Ms. Waddell would testify to the following and other facts relevant to the Juror Bias claim:

- That her "father knew that Kelly Harrington was the son of his first cousin, Theodore Roosevelt [Johnny] Harrington, prior to serving on Mr. Conaway's jury";

- That the fact that "Kelly Harrington was the son of his first cousin is not something my father would have easily forgotten";

---

[11]Ms. Waddell's draft affidavit contains handwritten revisions that, according to Smith, were requested by her attorney. In addition, Smith filed, as an exhibit to his affidavit, a fax cover sheet dated March 29, 2000, with the subject "Celia Waddell's Affidavit," from Smith to Ms. Waddell's attorney. The fax cover sheet contained a handwritten note from Smith: "I read this to Celia over the phone last night and she agreed to sign after she spoke to a lawyer." J.A. 1570.

- That Kelly Harrington bore a "strong resemblance to his father [Johnny Harrington]";

- That she heard Juror Waddell say on several occasions prior to Conaway's trial that "I hope I get on this jury because if [Conaway] did it, he should die";

- That when Juror Waddell was called for jury duty, she had a "heated discussion" with him;

- That she told Juror Waddell "you're not supposed to be on this jury, because you're related to one of the guys involved"; and

- That she told her father that "not disclosing his family relationship to Kelly Harrington was wrong," and he responded that she "didn't know what [she] was talking about."

J.A. 1571-72. In testifying, Ms. Waddell would also, according to Smith, explain the familial relationship between Juror Waddell and Harrington as follows: Rannie Waddell, Sr. (Juror Waddell's father) and Willie Harrington (Kelly Harrington's grandfather) were half-brothers who had the same mother. Rannie Waddell, Sr., and Willie Harrington married sisters, Aggie and Nancy McKay. Their respective children — including Juror Waddell and Johnny Harrington (Kelly's father) — were first cousins who shared three of four grandparents (two maternal grandparents and a paternal grandmother). *See id.* at 1571.[12] By his affidavit, Smith related that he had previously

---

[12]Smith explained in his affidavit that Richmond County's records are not sufficient to confirm the sibling and cousin relationships described herein, as the birth indices for African-American children born before 1932 reflect only a child's last name and the name of one parent. J.A. 1566. Because Johnny Harrington (co-defendant Harrington's father) and Juror Waddell were born in 1937, the records were insufficient to establish that their fathers (respectively Willie Harrington and Rannie Waddell, Sr.) were half-brothers. *Id.* Smith determined that Johnny Harrington's and Juror Waddell's mothers shared the same last name (McKay), and their "apparent place" of birth was in the adjacent county of Marlboro, in South Carolina. *Id.* at 1566-67.

met with Juror Waddell's brother, Vance Waddell, who confirmed that he and Juror Waddell were first cousins to Johnny Harrington, Kelly's father. J.A. 1568. According to Smith, Vance Waddell initially agreed to execute an affidavit to that effect, but he thereafter failed to return Smith's calls. *Id.*[13]

### C.

On February 8, 2002, the magistrate judge recommended that the district court deny each of Conaway's claims for federal habeas corpus relief, including the Juror Bias claim, as well as his request for funds to hire a genealogy expert and to supplement the record. *Conaway v. French*, No. 98-1117, slip op. at 28 (M.D.N.C. filed Feb. 8, 2002). According to the magistrate judge, Conaway had not been diligent in attempting to develop the factual basis for his allegations, in that he did not attempt to obtain affidavits from Harrington or Waddell's family until 1997. *Id.* at 25. The judge further observed that, even if Conaway's allegations were true, he had "presented no evidence to show actual bias, and the relationship is not close enough to presume bias." *Id.* at 27.[14]

---

[13]Throughout these proceedings, the district court and the State have treated and accepted the affidavits that Conaway submitted to the district court as allegations of the petition. We have treated those affidavits in the same manner for the purposes of this appeal, although, as we explain, *infra* note 25, the allegations of the petition are sufficient for purposes of our rulings on the Juror Bias claim.

[14]In this appeal, Conaway has been granted leave, pursuant to Local Rule 28(b), to file attachments to his briefs, including, inter alia: (1) a 2004 email from Celia Waddell (Juror Waddell's daughter) to Conaway's attorney indicating that she would "not sign or give any affidavit on this matter," that she realized that her decision "could lead to further legal action granted by[ ] the courts," and that she was "willing to deal with" such legal action if necessary, *see* Attachment to Appellant's Br. at 2; (2) the 2005 affidavit of Nancy McKay Harrington (co-defendant Harrington's grandmother) explaining that the Waddell and Harrington families were "very close," and that Juror Waddell and Johnny Harrington (co-defendant Harrington's father) were "first cousins and the same age" and in the same high school class, so "they spent a lot of time together," *id.* at 4; (3) pages from the Rockingham High School year-

1.

In 2001, while Conaway's habeas corpus petition was pending in federal court, North Carolina enacted a statute barring the execution of mentally retarded offenders. *See* N.C. Gen. Stat. § 15A-2005. A convicted offender seeking to avoid execution under that statute is obliged to show that he has "[s]ignificantly subaverage general intellectual functioning, existing concurrently with significant limitations in adaptive functioning, both of which were manifested before the age of 18." *Id.* § 15A-2005(a)(1)(a). The statute defines "[s]ignificantly subaverage general intellectual functioning" as "[a]n intelligence quotient of 70 or below." *Id.* § 15A-2005(a)(1)(c).

Following the enactment of section 15A-2005, Conaway filed another MAR ("MAR II") in the Superior Court of Richmond County on January 31, 2002, contending that his death sentence should be commuted to life in prison because he is mentally retarded under North Carolina law. In support of MAR II, Conaway submitted the affidavit of Dr. Fisher stating that: (1) Conaway had scored a 68 on an IQ test in 2001 (at the age of 34); and (2) Fisher was then (in 2002) of the opinion that Conaway was mentally retarded, notwithstanding having testified to the contrary at Conaway's 1992 sentencing hearing.

On February 14, 2002, the MAR Court denied MAR II because Conaway had "presented absolutely no affidavit or documentary evi-

---

books from 1956 and 1957 showing that Juror Waddell and Johnny Harrington were in the same 29-student class section, *id.* at 15-19; (4) affidavits from other family members and friends to the same effect; and (5) the 2005 affidavit of Christopher D. Ricks, the foreman of Conaway's jury, stating that a juror closely resembling Juror Waddell was "particularly adamant about Conaway's guilt throughout the trial," and that — prior to deliberations — that juror said "I don't even know why we're doing this . . . that boy is guilty as sin," *see* Attachment to Reply Br. at 3. Because these attachments were not submitted to the district court, we have not considered them in resolving this appeal. We do not, however, preclude these materials and related evidence from being considered on remand, to the extent such consideration may be appropriate. *See infra* note 28.

dence that [he] had an intelligence quotient of 70 or below before the age of 18." *State v. Conaway*, No. 91 CRS 5877-5878, slip op. at 1 (N.C. Super. Ct. Feb. 14, 2002). The court also observed that Dr. Fisher's 2002 opinion lacked credibility because he had earlier concluded, in 1992, that Conaway was not mentally retarded, and that an IQ score of 68 at age 34 did not establish that Conaway had manifested significantly subaverage general intellectual functioning before the age of 18, as required by section 15A-2005. *Id.*

Thereafter, Conaway filed a motion to vacate the denial of MAR II, which the MAR Court rejected on May 13, 2002. *State v. Conaway*, No. 91 CRS 5877-5878 (N.C. Super. Ct. May 13, 2002). Conaway then petitioned the Supreme Court of North Carolina for a writ of certiorari on the MAR II ruling. This petition was denied on June 27, 2002. *State v. Conaway*, 565 S.E.2d 673 (N.C. 2002).

2.

On June 20, 2002, the Supreme Court of the United States decided *Atkins v. Virginia*, holding that the Eighth Amendment to the Constitution precludes the execution of a convicted offender who is mentally retarded. *See* 536 U.S. 304, 321 (2002). In so ruling, the Court left it to the various states to develop "appropriate ways to enforce the constitutional restriction" against executing mentally retarded offenders. *Id.* at 317 (internal quotation marks omitted). On August 22, 2002, Conaway filed an application for habeas corpus in the Supreme Court of North Carolina, seeking relief, under both North Carolina law and the *Atkins* decision, from the MAR Court's rejection of his mental retardation claim. On September 3, 2002, Conaway's state habeas corpus application was denied. *State v. Conaway*, 569 S.E.2d 655 (N.C. 2002).

On October 21, 2002, Conaway sought — and on January 23, 2003, received — leave from the district court to amend his federal habeas corpus petition to include, inter alia, his claim for relief from execution under *Atkins*. In his amended petition, Conaway contended, inter alia: (1) he is mentally retarded under North Carolina law and thus entitled to relief from execution under *Atkins*; and (2) the MAR Court's ruling that he was not mentally retarded under North Carolina

law deprived him of the due process protections of the Fourteenth Amendment.

On July 23, 2003, the federal magistrate judge recommended that the district court deny the *Atkins* claim because Conaway had been accorded an "ample opportunity to litigate the [mental retardation] issue in state court," and because the MAR Court's factual determination was entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). *Conaway v. French*, No. 98-1117, slip op. at 11 (M.D.N.C. filed July, 23, 2003). The magistrate judge saw no error in the MAR Court's determination that Conaway had failed to establish that he was mentally retarded under North Carolina law. *Id.*

### D.

On January 23, 2004, the district court adopted the magistrate judge's various recommendations and dismissed Conaway's petition for habeas corpus relief in all respects. *Conaway v. French*, No. 98-1117 (M.D.N.C. Jan. 23, 2004). Conaway thereafter filed a motion, pursuant to Federal Rule of Civil Procedure 59(e), to alter or amend the judgment dismissing his claims. This motion was denied on May 14, 2004.

On June 10, 2004, Conaway filed a timely notice of appeal. On April 20, 2005, we granted Conaway the COA on his two appellate claims: (1) that his Sixth Amendment right to an impartial jury was contravened because Juror Waddell, on voir dire, concealed his close familial relationship to co-defendant and key prosecution witness Harrington (the Juror Bias claim); and (2) that Conaway is entitled to relief from his death sentences because he is mentally retarded under North Carolina law (the *Atkins* claim). We possess jurisdiction pursuant to 28 U.S.C. § 2253.[15] As explained below, we remand to the dis-

[15]Section 2253(a) of Title 28 provides, in relevant part, that "[i]n a habeas corpus proceeding . . . before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held." Section 2253(c)(1)(A) precludes a court of appeals from exercising § 2253(a) jurisdiction, "[u]nless a circuit justice or judge issues a [COA]." Pursuant to § 2253(c)(2), a COA "may issue . . . . only if the applicant has made a substantial showing of the denial of a constitutional right."

trict court for an evidentiary hearing on the Juror Bias claim, and we affirm the court's dismissal of the *Atkins* claim.

## II.

We review de novo a district court's dismissal of a petition for habeas corpus relief. *Conner v. Polk*, 407 F.3d 198, 204 (4th Cir. 2005). Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may only grant habeas corpus relief on a claim adjudicated "on the merits" by a state court if the state court's ruling was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d). A state court decision constitutes an "unreasonable" application of federal law if the decision "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-08 (2000), or is "'unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled,'" *Bates v. Lee*, 308 F.3d 411, 417 (4th Cir. 2002) (quoting *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000) (plurality opinion)). A state court's findings of fact on a claim being pursued in federal habeas proceedings are presumed correct unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

We review for abuse of discretion a district court's failure to conduct an evidentiary hearing or to authorize discovery proceedings. *Conner*, 407 F.3d at 204. In conducting such a review, we are mindful that, "[b]y definition, a court abuses its discretion when it makes an error of law." *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005) (internal quotation marks omitted). A petitioner who has diligently pursued his habeas corpus claim in state court is entitled to an evidentiary hearing in federal court, on facts not previously developed in the state court proceedings, if the facts alleged would entitle him to relief, and if he satisfies one of the six factors enumerated by the Supreme Court in *Townsend v. Sain*, 372 U.S. 293, 313 (1963).[16] *See Fisher v. Lee*, 215 F.3d 438, 454 (4th Cir. 2000). In

---

[16]The six *Townsend* factors, one of which must be satisfied in order to obtain an evidentiary hearing in a federal habeas corpus proceeding, are:

addition, a federal court is not permitted to grant relief to a habeas corpus petitioner unless the error of which he complains had a "'substantial and injurious effect or influence'" on the outcome of the underlying state court proceeding. *Fullwood v. Lee*, 290 F.3d 663, 679 (4th Cir. 2002) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

In assessing whether a federal habeas corpus petition was properly dismissed without an evidentiary hearing or discovery, we must evaluate the petition under the standards governing motions to dismiss made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Walker v. True*, 399 F.3d 315, 319 n.1 (4th Cir. 2005). Accordingly, we are obliged to accept a petitioner's well-pleaded allegations as true, and we are to draw all reasonable inferences therefrom in the petitioner's favor. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

## III.

By the Juror Bias claim, Conaway contends that Juror Waddell's concealment on voir dire of his relationship to co-defendant Harrington, a key prosecution witness, deprived Conaway of his Sixth Amendment right to trial by an impartial jury. The Sixth Amendment, made applicable to state criminal proceedings through the Fourteenth, affords an accused the right to trial by an impartial jury. *See Duncan v. Louisiana*, 391 U.S. 145, 160 (1968); *Jones v. Cooper*, 311 F.3d 306, 310 (4th Cir. 2002). As the Supreme Court has observed, a "touchstone of a fair trial is an impartial trier of fact — 'a jury capa-

---

(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; *(5) the material facts were not adequately developed at the state-court hearing*; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Townsend*, 372 U.S. at 313 (emphasis added).

ble and willing to decide the case solely on the evidence before it.'"
*McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554
(1984) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)).

In contesting Conaway's position on the Juror Bias claim, the State
makes three principal contentions: (1) that Conaway procedurally
defaulted on the claim; (2) that the MAR Court's decision on the
claim was not an unreasonable application of clearly established fed-
eral law as determined by the Supreme Court; and (3) that Conaway
is not entitled to an evidentiary hearing in federal court because he
failed to diligently pursue the Juror Bias claim and because his allega-
tions are insufficient to entitle him to relief thereon. As explained
below, we reject each of these contentions.

## A.

As a preliminary matter, we conclude that Conaway has not proce-
durally defaulted on the Juror Bias claim by failing to support MAR
I with admissible evidence. A claim asserted in a federal habeas cor-
pus proceeding has been procedurally defaulted, and is therefore not
subject to federal review, when "a state court has declined to consider
the claim's merits on the basis of an adequate and independent state
procedural rule." *Fisher v. Angelone*, 163 F.3d 835, 844 (4th Cir.
1998). If the decision of the "last state court to which the petitioner
presented his federal claims . . . did not clearly and expressly rely on
an independent and adequate state ground, a federal court may
address the petition." *Coleman v. Thompson*, 501 U.S. 722, 735
(1991) (recognizing that state court resolution does not "clearly" rest
on independent procedural bar if "interwoven" with federal claim);
*see also Jenkins v. Hutchinson*, 221 F.3d 679, 682-83 (4th Cir. 2000).

In asserting that Conaway procedurally defaulted, the State mis-
construes the MAR Court's decision in MAR I, as well as the govern-
ing procedural requirements in North Carolina. Although the MAR
Court remarked that Conaway had failed to support the claim with
"any affidavit or documentary evidence that Mr. [Waddell] is, in fact,
related to the Co-Defendant Harrington," *State v. Conaway*, No. 91
CRS 5877-5878, slip op. at 11 (N.C. Super. Ct. Jan. 22, 1998),[17] it did

---

[17]The MAR Court failed to acknowledge the affidavit of Conaway's
attorney, Berry, in which she stated that Juror Waddell was a double first

not premise its denial of the Juror Bias claim in MAR I on a lack of admissible evidence (as the State would now have it). Rather, the MAR Court's conclusion relied on its determination that the MAR I allegations, if substantiated, would not "constitute . . . a violation of the State or Federal Constitution." *See id.* As the district court recognized, the MAR Court thereby denied the Juror Bias claim "on the merits." By reaching the merits of the Juror Bias claim, the MAR Court thus did not "clearly and expressly" rely on an independent and adequate state procedural rule. *See Coleman*, 501 U.S. at 735.

Moreover, contrary to the State's contention, North Carolina does not mandate that admissible evidence must be submitted to an MAR court *before* an evidentiary hearing can be conducted. *See Robinson v. Polk*, ___ F.3d ___, No. 05-01, slip op. at 26 (4th Cir. Feb. 14, 2005). Rather, the applicable North Carolina statute requires that an MAR premised upon facts not in the trial court record be supported by "affidavits or documentary evidence." N.C. Gen. Stat. § 15A-1420(b)(1). There is no authority under North Carolina law (nor has the State asserted any to us) requiring that such affidavits and documents themselves constitute *admissible* evidence. In deciding whether an evidentiary hearing is warranted, an MAR court is obliged, under the applicable North Carolina statute, to determine whether the allegations of an MAR and the materials submitted in support thereof raise questions of fact which, if resolved in the defendant's favor, would entitle him to relief. *See id.* § 15A-1420(c)(1); *see also State v. McHone*, 499 S.E.2d 761, 763 (N.C. 1998) ("[A]n evidentiary hearing is required unless the [MAR] presents assertions of fact which will entitle the defendant to no relief even if resolved in his favor, or the [MAR] presents only questions of law."). If such questions are raised,

---

cousin of co-defendant Harrington's father. *See* J.A. 1476. Such an affidavit is, in North Carolina, the equivalent to an offer of proof, and it should have been sufficient to create a question of fact to be resolved in an evidentiary hearing. *See State v. McHone*, 499 S.E.2d 761, 764 (N.C. 1998) (remanding for evidentiary hearing where affidavit from prosecutor's assistant and in-court representation by defense attorney created question of fact); *cf. United States v. Mason*, 52 F.3d 1286, 1292 (4th Cir. 1995) (observing that lawyers are officers of court and subject to disciplinary action if statements are untrue).

the MAR court must then conduct an evidentiary hearing and, at that time, assess the admissibility of the proffered evidence. *See* N.C. Gen. Stat. § 15A-1420(c)(4). Indeed, it would create a "classic catch-22" if an MAR defendant were obliged to submit admissible evidence to the MAR court in order to be accorded an evidentiary hearing, when the defendant is seeking the hearing because he cannot, without subpoena power or mechanisms of discovery, otherwise secure such evidence. *See United States v. Mason*, 52 F.3d 1286, 1292 (4th Cir. 1995). In these circumstances, we are unable to conclude that Conaway has procedurally defaulted on the Juror Bias claim, and he is therefore entitled to pursue the claim in his federal habeas corpus proceeding.[18]

## B.

Turning to the merits of the Juror Bias claim, we conclude that the MAR Court's denial of MAR I involved an unreasonable application of clearly established federal law as determined by the Supreme Court. The text of the Sixth Amendment mandates that "[i]n all crimi-

---

[18]On Conaway's direct appeal, the Supreme Court of North Carolina explained that the trial court's failure to question Juror Waddell in response to Conaway's motion of October 19, 1992 (before the trial's sentencing phase began) was justified in part by Conaway's "critical delay" in advising the trial court of the anonymous phone call concerning Juror Waddell's relationship to co-defendant Harrington. *See State v. Conaway*, 453 S.E.2d 824, 844 (N.C. 1995). And, as Judge Widener points out in his separate opinion, Conaway and his lawyers could have brought the phone call to the trial court's attention earlier. The State, however, has never asserted that this nine-day delay constituted a proce-dural default, and we need not, in these circumstances, raise and address it *sua sponte*. *See Trest v. Cain*, 522 U.S. 87, 89 (1997) ("A court of appeals is not 'required' to raise the issue of procedural default *sua sponte*."); *Yeatts v. Angelone*, 166 F.3d 255, 261 (4th Cir. 1999) (observ-ing that courts should balance comity and efficiency with petitioner's "substantial interest in justice" in deciding whether to raise procedural default *sua sponte*). In any event, the delay would not constitute a proce-dural default, as "the last state court" to which Conaway presented the Juror Bias claim (the MAR Court) "did not clearly and expressly rely on" — or indeed even reference — the delay. *See Coleman*, 501 U.S. at 735. Moreover, Conaway has not asserted here that the delay implicates a claim of constitutional ineffective assistance by his counsel.

nal prosecutions, the accused shall enjoy the right to a . . . trial[ ] by an impartial jury." U.S. Const. amend. VI. And the Supreme Court has long recognized that the Sixth Amendment prohibits biased jurors from serving on criminal juries. *See United States v. Wood*, 299 U.S. 123, 133 (1936) (recognizing Sixth Amendment's text prohibits partial jurors, whether bias is "actual or implied"). The Court has explained that a juror's bias may be established by showing (1) that the juror "failed to answer honestly a material question on *voir dire*"; and (2) that "a correct response [to that question] would have provided a valid basis for a challenge for cause." *See McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984) (the "*McDonough* test").[19] Additionally, a litigant must show that the fairness of his trial was affected either by the juror's "motives for concealing [the] information" or the "reasons that affect [the] juror's impartiality." *Id.*[20]

By MAR I, Conaway alleged that Juror Waddell failed to disclose that he was co-defendant Harrington's double first cousin, once removed, and Conaway supported his allegations with an affidavit of his lawyer Berry, as well as the trial's voir dire transcript. The MAR Court denied the Juror Bias claim on the merits, concluding that Conaway's MAR I allegations, if substantiated, would not "constitute . . . a violation of the State or Federal Constitution." *See State v. Conaway*, No. 91 CRS 5877-5878, slip op. at 11 (N.C. Super. Ct. Jan. 22, 1998). As explained below, the MAR I allegations were sufficient under *McDonough* to state a constitutional claim for relief, and thus the MAR Court's ruling on the Juror Bias claim was unreasonable.

---

[19]Although *McDonough* was itself a federal civil proceeding, we have expressly recognized its applicability to Sixth Amendment claims in federal habeas corpus proceedings instituted by state prisoners. *See Jones v. Cooper*, 311 F.3d 306, 310 (4th Cir. 2002).

[20]The *McDonough* test for juror bias is generally characterized as having two parts. *See Jones v. Cooper*, 311 F.3d 306, 310 (4th Cir. 2002). The inquiry into whether a trial's fairness was affected essentially constitutes a third part, however, as it must be satisfied before the juror's bias may be proven. *See id.* at 313. In any event, we adhere to the uniform practice of referring to the *McDonough* test as having two parts.

1.

Turning to the first part of the *McDonough* test, Conaway's allegations in the MAR Court demonstrated that Juror Waddell had "failed to answer honestly [several] material question[s] on *voir dire*." *See McDonough*, 464 U.S. at 556. On voir dire, Juror Waddell was asked whether he "kn[e]w any of those people who may testify for the State." In response, Juror Waddell asserted that he was familiar with the list of the State's prospective witnesses, acknowledging only that he knew Sheriff Jarrell. Juror Waddell was asked whether "a close friend or family member[ ] had any dealings with the District Attorney's office," to which he responded negatively. When the prosecutor asked Juror Waddell whether there was "any reason whatsoever, whether I've asked you or not that you could think of that would keep you from being fair and impartial in this case," Juror Waddell again responded, "No."

Conaway alleged in MAR I that Juror Waddell knew he was related to co-defendant Harrington, and that Waddell failed to disclose this information in response to material questions on voir dire. Given the multiple questions posed to Juror Waddell that could candidly be answered only by acknowledging his kinsman, it was unreasonable for the MAR Court to conclude that Conaway's MAR I allegations were insufficient to satisfy the first part of the *McDonough* test.

2.

Conaway's allegations to the MAR Court also satisfy the second part of the *McDonough* test: Had Juror Waddell truthfully responded at voir dire, his answers "would have provided a valid basis for a challenge for cause," under the applicable federal constitutional principles. *See McDonough*, 464 U.S. at 556. The Supreme Court has long recognized the constitutionally based principle that a prospective juror may be validly challenged for cause if he cannot be impartial. *See, e.g.*, *McDonough*, 464 U.S. at 554 ("*Voir dire* examination serves to protect th[e] right [to an impartial jury] by exposing possible biases, both known and unknown, on the part of potential jurors. Demonstrated bias in the responses to questions on *voir dire* may result in a juror's being excused for cause . . . ."); *United States v.*

*Wood*, 299 U.S. 123, 133 (1936) ("All persons otherwise qualified for jury service are subject to examination as to actual bias."). And close kinship between a juror and a participant in a criminal trial constitutes a classic form of juror partiality. As far back as the early 1930s, Justice Cardozo clairvoyantly predicted the factual scenario underlying the Juror Bias claim when, in writing for the Court, he utilized a hypothetical juror related to a litigant as the ultimate example of a partial juror:

> What was sought to be attained was the choice of an impartial arbiter. What happened was the intrusion of a partisan defender. *If a kinsman of one of the litigants had gone into the jury room disguised as the complaisant juror, the effect would have been no different.*

*Clark v. United States*, 289 U.S. 1, 11 (1933) (emphasis added) (affirming criminal contempt conviction for juror who lied on voir dire); *see also Dyer v. Calderon*, 151 F.3d 970, 983 (9th Cir. 1998) (en banc) ("Just as we would presume bias if the brother of the prosecutor were on a jury, we presume bias where a juror lies in order to secure a seat on the jury.").

On the basis of Conaway's allegations in MAR I, Juror Waddell's familial relationship to Harrington was sufficiently close that Waddell's bias would have been "implied" — that is, presumed as a matter of law. *See, e.g.*, *Wood*, 299 U.S. at 133 ("The bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as [a] matter of law."); *see also Jones v. Cooper*, 311 F.3d 306, 313 (4th Cir. 2002). Such a presumption is justified where a juror is "a close relative of one of the participants in the trial or the criminal transaction." *See Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring). If Juror Waddell had responded candidly on voir dire about his relationship to co-defendant Harrington, the doctrine of implied bias would have provided Conaway with a valid basis for a challenge for cause."

In contesting Conaway's invocation of the implied bias principle, the State incorrectly asserts that the doctrine of implied bias was abrogated by the Court over twenty years ago in *Smith v. Phillips*. To the contrary, the doctrine of implied or presumed bias has been recog-

nized from our country's earliest days, and it remains firmly rooted. As Judge Kozinski aptly explained in 1998 for an en banc Ninth Circuit majority:

> Presumed bias dates back in this country at least to Aaron Burr's trial for treason, where Chief Justice Marshall, riding circuit, noted that an individual under the influence of personal prejudice "is *presumed* to have a bias on his mind which will prevent an impartial decision of the case, according to the testimony." Marshall explained, "He may declare that notwithstanding these prejudices he is determined to listen to the evidence, and be governed by it; *but the law will not trust him.*" *United States v. Burr*, 25 F. Cas. 49, 50 (D. Va. 1807) (emphasis added).

*Dyer*, 151 F.3d at 984 (presuming bias where juror concealed that her brother was victim of similar crime). Moreover, as the *Dyer* court observed, "[n]o opinion in the two centuries of the Republic . . . has suggested that a criminal defendant might lawfully be convicted by a jury tainted by implied bias." *Id.* at 985; *see also Smith*, 455 U.S. at 223 (O'Connor, J., concurring) ("None of our previous cases preclude the use of the conclusive presumption of implied bias in appropriate circumstances.").

To be sure, the *Smith* Court declined to presume such bias in a setting where a juror had applied for employment with the prosecutor's office during the defendant's trial, and a hearing disclosed no indication that the juror was, in fact, biased. *See* 455 U.S. at 212-13. Nothing in the *Smith* decision, however, indicates that the Court intended to discard the doctrine of implied or presumed bias. Indeed, Justice O'Connor wrote separately on this point, expressing her "view that the [majority] opinion does not foreclose the use of 'implied bias' in appropriate circumstances," such as a close familial relationship. *Id.* at 221-22 (O'Connor, J., concurring). And in *McDonough*, decided by the Court two years after *Smith*, five Justices wrote or joined concurring opinions emphasizing that the doctrine of implied bias was yet available. *See McDonough*, 464 U.S. at 556-57 (Blackmun, J., concurring, joined by Stevens, J., and O'Connor, J.) (observing that "in exceptional circumstances,[ ] the facts are such that bias is to be inferred"); *id.* at 558 (Brennan, J., concurring in the judgment, joined

by Marshall, J.) (recognizing that "[b]ecause the bias of a juror will rarely be admitted by the juror himself . . . it necessarily must be inferred from surrounding facts and circumstances"); *see also Solis v. Cockrell*, 342 F.3d 392, 395 n.6 (5th Cir. 2003) (noting that five Justices in *McDonough* agreed on "vitality" of implied bias doctrine).[21] It would be unreasonable to conclude, as the State urges here, that this bedrock principle of constitutional jurisprudence was abandoned without so much as a whisper from the Supreme Court.

Not surprisingly, each court of appeals to have addressed the issue agrees that the doctrine of implied bias remains, after *Smith*, a settled constitutional principle.[22] As the Fifth Circuit observed, "[w]hile the

---

[21]We have consistently treated Justice O'Connor's concurrence in *Smith* as the authoritative articulation of implied bias. *See, e.g.*, *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988) (recognizing implied bias principle as limited to extreme situations where relationship between prospective juror and litigation such that "it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances" (citing *Smith*, 455 U.S. at 222 (O'Connor, J., concurring))).

[22]Since the Court's 1982 decision in *Smith*, at least ten circuits have recognized the continuing viability of the implied bias principle. *See United States v. Scott*, 854 F.2d 697, 699 (5th Cir. 1988) (presuming bias where juror failed to disclose that his brother worked in sheriff's office); *Hunley v. Godinez*, 975 F.2d 316, 320 (7th Cir. 1992) (affirming finding of implied bias where jury was burglarized while sequestered during trial concerning similar burglary); *Green v. White*, 232 F.3d 671, 678 (9th Cir. 2000) (recognizing "implied bias" where juror lied about felony convictions); *Burton v. Johnson*, 948 F.2d 1150, 1158 (10th Cir. 1991) (affirming finding of implied bias where juror was abused in similar manner as victim); *Isaacs v. Kemp*, 778 F.2d 1482, 1489 (11th Cir. 1985) (presuming bias due to pervasive pretrial publicity); *see also Amirault v. Fair*, 968 F.2d 1404, 1405-06 (1st Cir. 1992) (recognizing implied bias doctrine but declining to award relief under circumstances); *United States v. Torres*, 128 F.3d 38, 45-46 (2d Cir. 1997) (same); *United States v. Calabrese*, 942 F.2d 218, 224 (3d Cir. 1991) (same); *Zerka v. Green*, 49 F.3d 1181, 1186 n.7 (6th Cir. 1995) (same); *Cannon v. Lockhart*, 850 F.2d 437, 440-41 (8th Cir. 1988) (same). To be sure, we suggested in *Conner v. Polk* that there might be "some question" after *Smith* whether implied bias remained a viable doctrine. *See* 407 F.3d 198, 206 n.4 (4th Cir. 2005). As our analysis here demonstrates, however, it could not reasonably be concluded that *Smith* overturned two centuries of Supreme Court precedent by declining to presume bias in a particular set of circumstances.

Supreme Court has oft-rejected application of the implied bias princi-
ple, . . . it has never rejected the principle itself." *Brooks v. Dretke*,
418 F.3d 430, 435 (5th Cir. 2005) (reversing death sentence due to
presumption of bias where juror was charged during trial with weap-
ons offense by district attorney's office which was prosecuting case).
In these circumstances, we are constrained to agree with the observa-
tion of Judge Kozinski in *Dyer*: "Courts disagree (*e.g.*, *Smith*) about
when the doctrine applies, not whether it exists." *Dyer*, 151 F.3d at
985 n.24. Accordingly, the implied bias principle constitutes clearly
established federal law as determined by the Supreme Court. And, on
the basis of Conaway's MAR I allegations, it was unreasonable for
the MAR Court to conclude that, even if Juror Waddell had been can-
did on voir dire, Conaway would nevertheless have lacked a valid
basis for challenging Juror Waddell for cause.[23]

3.

Even where, as here, the two parts of the *McDonough* test have
been satisfied, a juror's bias is only established under *McDonough* if
the juror's "motives for concealing information" or the "reasons that
affect [the] juror's impartiality can truly be said to affect the fairness
of [the] trial." *McDonough*, 464 U.S. at 556; *see also Conner v. Polk*,
407 F.3d 198, 206-07 (4th Cir. 2005). In MAR I, Conaway alleged
facts sufficient to establish that Juror Waddell concealed crucial infor-
mation in order to serve on Conaway's jury. Such "dishonesty, of
itself, is evidence of bias." *Burton v. Johnson*, 948 F.2d 1150, 1159
(10th Cir. 1991); *see also United States v. Colombo*, 869 F.2d 149,
151-52 (2d Cir. 1989) (recognizing that lying during voir dire is

---

[23]Although unnecessary to our resolution of the Juror Bias claim, we
note that applicable state jury selection principles would also have pro-
vided a valid basis for challenging Juror Waddell for cause. *See* N.C.
Gen. Stat. § 15A-1212(5) (providing that prospective juror may be chal-
lenged for cause if "related by blood or marriage within the sixth degree
to the defendant or the victim of the crime"); *see also State v. Allred*, 169
S.E.2d 833 (N.C. 1969). In this proceeding, the State concedes that,
under Conaway's allegations, Juror Waddell and co-defendant Harring-
ton are related by blood within the fifth degree under North Carolina law.
*See* Appellee's Br. at 34; *see also* N.C. Gen. Stat. § 104A-1(2) (defining
degrees of kinship).

inconsistent with obligation to "weigh the evidence fairly and obey the instructions of the court").

Moreover, Juror Waddell's relationship to co-defendant Harrington necessarily affected the fairness of Conaway's trial. Put simply, Conaway's trial was a swearing match, with Conaway and his co-defendants accusing each other of the heinous murders of Weatherford and Callahan. As the prosecutor acknowledged in his closing argument, the jury could not convict Conaway without crediting Harrington's version of events over that presented in Conaway's own testimony. *See* J.A. 1082 ("[I]f you believe what Kelly Harrington told you . . . [y]ou can convict Mr. Conaway of all the charges. If you believe Mr. Conaway . . . then you will acquit Mr. Conaway. It's really simple."). And as Lord Coke aptly observed, "no matter how remote soever, . . . the law presumeth that one kinsman doth favor another before a stranger." *State v. Allred*, 169 S.E.2d 833, 837 (N.C. 1969) (quoting *Thomas's Coke*, 3 Vol. 518) (internal quotation marks omitted).

As a result, it was unreasonable for the MAR Court to conclude that the allegations in MAR I were legally insufficient, under the clearly established *McDonough* principles, to show that juror bias infringed Conaway's constitutional right to an impartial jury. Section 2254(d)(1) of AEDPA therefore does not preclude Conaway from obtaining federal habeas corpus relief on the Juror Bias claim, because the MAR Court's decision involved an unreasonable application of clearly established federal law as determined by the Supreme Court.

### C.

For similar reasons, the district court erred in dismissing the Juror Bias claim without an evidentiary hearing. As explained below, the district court erroneously determined that 28 U.S.C. § 2254(e)(2) precluded Conaway from being accorded an evidentiary hearing on that claim, and it erred in ruling that Conaway had not alleged facts sufficient to entitle him to relief.

Under AEDPA, a federal district court may not ordinarily grant an evidentiary hearing on a claim that was presented to a state court

when the petitioner "has failed to develop the factual basis of a claim in State court proceedings." *See* § 2254(e)(2). A petitioner has not "failed to develop" the facts of his claim, however, if he has "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Williams (Michael) v. Taylor*, 529 U.S. 420, 435 (2000). At a minimum, a diligent petitioner must "seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437.

On the facts presented in this record, Conaway reasonably attempted, in light of the information available to him at the relevant times, to investigate and pursue the Juror Bias claim in state court. His efforts were thwarted, however, by reluctant witnesses and unreceptive courts. Conaway's direct appeal was not resolved until October 1995, and his post-conviction lawyers were not appointed until July 1996. Although Conaway's request for funds to hire an investigator was denied, his attorneys personally investigated the Juror Bias claim, sometimes at their own expense. *See, e.g.*, J.A. 1575. Despite their efforts, potential witnesses in both the Waddell and Harrington families were reluctant to cooperate with the lawyers, or they flatly refused to do so. And, as Conaway's lawyer Smith explained by affidavit, the official records of Richmond County are insufficient — apparently for race-based reasons — to establish the relationship between Juror Waddell and co-defendant Harrington. Moreover, Conaway's request for an evidentiary hearing in the MAR Court was denied, depriving him of the opportunity to build a factual record. Because Conaway has been reasonably diligent in pursuing his claim, and his failure to fully develop the facts related to the Juror Bias claim in state court is attributable to external causes, § 2254(e)(2) does not preclude him from being accorded an evidentiary hearing in federal court. *See Williams*, 529 U.S. at 443.

When a state court has denied a habeas corpus petitioner the opportunity to develop his claims, he is entitled to an evidentiary hearing in federal court if he can establish one of the six factors enumerated by the Supreme Court in *Townsend v. Sain*, 372 U.S. 293 (1963), and if he has alleged facts which, if true, would entitle him to relief. *See Walker v. True*, 399 F.3d 315, 327 (4th Cir. 2005). A petitioner is not to be awarded relief, however, on the basis of an error that was harmless, in that it did not have a "'substantial and injurious effect or influ-

ence'" on the outcome of the underlying proceeding. *Fullwood v. Lee*, 290 F.3d 663, 679 (4th Cir. 2002) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). And where the court is in "grave doubt," as to the effect of a constitutional error — that is, if the court is in "virtual equipoise" regarding an error's harmlessness — the petitioner is entitled to an evidentiary hearing. *See Fullwood*, 290 F.3d at 679.

Conaway has never been afforded an opportunity to develop the facts underlying the Juror Bias claim, and he can therefore satisfy at least the fifth *Townsend* factor. *See Townsend*, 372 U.S. at 313 (listing factors that require hearing, including "(5) the material facts were not adequately developed at the state-court hearing"). And, as our foregoing analysis demonstrates, Conaway has stated a valid claim for relief under *McDonough*: Conaway has alleged in his federal habeas corpus petition, as he did in MAR I, that Juror Waddell concealed his relationship to co-defendant Harrington during the voir dire proceedings, which affected the fairness of Conaway's trial.

Furthermore, in addition to the MAR I allegations, Conaway has alleged in his federal proceedings that, during voir dire, Juror Waddell failed to honestly answer several material questions — such as whether he had formed any opinion concerning Conaway's trial — that would have exposed Juror Waddell's previous statements that he "hope[d to] get on this jury because if [Conaway] did it, he should die."[24] In *Morgan v. Illinois*, the Supreme Court reiterated that "[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating cir-

---

[24]Although Conaway did not seek relief in MAR I based on Juror Waddell's statements that Conaway should die, he cannot be faulted for his failure to do so. Conaway had not yet discovered Juror Waddell's statements because, under these allegations, Waddell had concealed them, and Conaway's efforts to obtain information from Juror Waddell's family — without the mechanisms of discovery — had yet proved fruitless. *See Williams*, 529 U.S. at 442-43 ("The Virginia Supreme Court's denial of the motion [concerning juror bias] is understandable in light of petitioner's vague allegations, but the vagueness was not the fault of petitioner. . . . The underdevelopment of these matters was attributable to [the juror and the prosecutor who failed to disclose their past professional relationship], if anyone.").

cumstances as the instructions require him to do." *See* 504 U.S. 719, 729 (1992). Accordingly, Juror Waddell could have been challenged for cause under *Morgan* if he had answered truthfully on voir dire. And as the Court said, if "even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Id.*

Conaway has alleged that he was convicted and sentenced to death by a jury that included a primary accuser's double first cousin, once removed, and his affidavits reflect that the juror had previously asserted that, if Conaway was guilty, he should die. In these circumstances, we need not labor to conclude that such a serious constitutional injury affected Conaway's substantial rights, nor are we in doubt as to the necessity of an evidentiary hearing. *See Fullwood*, 290 F.3d at 682 (concluding that allegations that spouse pressured juror to vote for death sentence "are of a type that draw into question the integrity of the verdict, and give rise to a presumption of prejudice" (internal quotation marks and citation omitted)). Yet Conaway has never been accorded the opportunity to develop the facts underlying his claim. *See Townsend*, 372 U.S. at 313. As the Supreme Court has "long held," the "remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *See, e.g.*, *Smith v. Phillips*, 455 U.S. 209, 215 (1982). The district court therefore committed an error of law — and abused its discretion — in denying Conaway an evidentiary hearing on the Juror Bias claim.[25]

## IV.

Finally, we turn to the *Atkins* claim, which was first raised in MAR II, and upon which we also awarded the COA. On appeal, Conaway asserts that the district court erred in denying him an evidentiary hearing to prove that he is entitled to relief from execution under *Atkins*

---

[25]Consistent with the manner in which the State and the district court treated the materials filed in the district court, we have considered affidavits submitted by Conaway to the district court that were not initially incorporated into his petition for habeas corpus. *See supra* note 13. As demonstrated by our analysis in Part III.B, however, the allegations of the petition alone, assessed under Rule 12(b)(6) principles, are sufficient to entitle Conaway to relief on the Juror Bias claim.

*v. Virginia*, 536 U.S. 304 (2002). In *Atkins*, the Court declared that the execution of mentally retarded offenders contravenes the Eighth Amendment's prohibition against cruel and unusual punishment. *Id.* at 321. In so doing, the Court left to the various states "the task of developing appropriate ways to enforce the constitutional restriction." *Id.* at 317 (internal quotation marks omitted). Accordingly, to prevail on the *Atkins* claim, Conaway must show that he should be deemed mentally retarded under North Carolina law. *See Walker v. True*, 399 F.3d 315, 319 (4th Cir. 2005).

In North Carolina, a convicted offender seeking to prove that he is mentally retarded is obliged to prove that he has (1) "significantly subaverage general intellectual functioning," and (2) "significant limitations in adaptive functioning," both of which had "manifested before the age of 18." N.C. Gen. Stat. § 15A-2005(a)(1)(a) & (a)(2). The statute defines "significantly subaverage general intellectual functioning" as "[a]n intelligence quotient of 70 or below." *Id.* § 15A-2005(a)(1)(c).[26]

Conaway contends in these proceedings, as he did in MAR II, that he is entitled to be deemed mentally retarded because he has an IQ of 68 and a lifetime record of major impairment in academics, employment, and life skills. In support of MAR II, Conaway submitted the affidavit of Dr. Fisher, asserting that Conaway had scored 68 on an IQ test in 2001 (when Conaway was 34 years old), and that, based on a 2001 examination, Fisher believed Conaway to be mentally retarded. The MAR Court rejected Conaway's claim, concluding that Conaway had consistently received an IQ score of 79 or 80 on tests administered prior to the age of 18, and had "presented absolutely no affidavit or documentary evidence that [he] had an [IQ] of 70 or below before the age of 18." *State v. Conaway*, No. 91 CRS 5877-5878, slip op. at 1 (N.C. Super. Ct. Feb. 14, 2002). The MAR Court further explained that the IQ score of 68 represented only Con-

---

[26]In order to show "significant limitations in adaptive functioning," a North Carolina offender must show limitations in at least two adaptive skill areas, including: "communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure skills, and work skills." N.C. Gen. Stat. § 15A-2005(a)(1)(b).

away's "current" score — that is, it did not show that Conaway had manifested the requisite IQ of 70 or below before the age of 18 — and that Fisher had testified at Conaway's 1992 sentencing hearing that Conaway was not mentally retarded. *Id.*

Although the MAR Court denied MAR II prior to the Supreme Court's *Atkins* decision, it determined that Conaway is not mentally retarded under North Carolina law, thereby deciding the dispositive issue in the *Atkins* claim. Accordingly, the court's disposition of MAR II constitutes an adjudication "on the merits" of the *Atkins* claim for purposes of AEDPA. *See Early v. Packer*, 537 U.S. 3, 7-8 (2002) (per curiam) (concluding that state court ruling which did not cite Supreme Court precedent was nonetheless "on the merits"); *Hill v. Ozmint*, 339 F.3d 187, 196 (4th Cir. 2003) ("[A] state court may adjudicate a claim 'on the merits' without relying on or citing relevant Supreme Court precedents." (citing *Early*)). On the record before the MAR Court, neither its application of the law nor its determination of the facts on the *Atkins* claim was unreasonable. *See* 28 U.S.C. § 2254(d)(1)-(2). We therefore affirm the district court's denial of the *Atkins* claim.[27]

## V.

Pursuant to the foregoing, we affirm the district court's dismissal of the *Atkins* claim. On the other hand, we remand for an evidentiary hearing on the Juror Bias claim and for such other and further proceedings as may be appropriate.[28]

---

[27]Significantly, Conaway has never alleged facts to support the conclusion that any of his childhood IQ tests could be unreliable as to whether his IQ was above 70 at the time the test was administered. *Cf. Walker*, 399 F.3d at 321-22 (discussing how IQ score of 76 could show IQ of 70, when accounting for "Flynn effect" and "standard error of measurement").

[28]We have not, in disposing of this appeal, taken into account the attachments submitted by Conaway to his briefs on appeal. *See supra* note 14. The district court may, however, to the extent it deems them relevant and admissible, consider such attachments and related materials on remand.

*AFFIRMED IN PART
AND REMANDED IN PART*

WIDENER, Circuit Judge, concurring:

I concur in the majority opinion in the decision that Conaway's execution is not precluded by the Eighth Amendment under *Atkins v. Virginia*, 536 U.S. 304 (2002). I also concur in the remand of the case for further consideration of the juror bias claim, but for a different reason than does the majority.

Conaway's attorneys knew of the telephone call with respect to the relationship between the juror Waddell and the witness and co-defendant Harrington at 1:45 p.m. October 10, 1992. October 10 was two days prior to the commencement of the trial, which started on October 12, 1992 with the empaneling of the jury, it having not been previously sworn, although selected, in proceedings in the trial court from Monday, October 5 through Friday, October 9, 1992. The telephone call referred to was described as anonymous and as follows:

> The gist of the call was that juror No. 1, I believe, is a cousin, and may be even a first cousin of the co-defendant Kelly Harrington. J.A. 1101f.

The jury had not been empaneled until the trial began, the morning of October 12, and North Carolina law was quite clear that the juror Waddell was disqualified as a cousin of a prosecuting witness as a matter of law under *State v. Allred*, 169 S.E. 2d 833 (N.C. 1969). But no challenge was made to the seating of Waddell at that time, or later, before verdict, and Conaway's attorneys moved only that the trial court "examine, juror No. 1, [Waddell] to ascertain his kinship, if any." The motion was denied. J.A. 1101g.

The trial on the merits commenced on October 12th, and continued on October 13, 14 and 15, when the case was sent to the jury. The jury returned its verdict the afternoon of the 15th. Conaway testified for himself on October 14th and 15th, and Harrington had testified on October 12th and 13th on behalf of the State. Both were cross-examined, as were all of the witnesses whose testimony was other

than purely routine and subject to little contradiction or interpretation. Through all four days of the trial on the merits, Conaway and his attorneys sat silent as to Waddell's disqualification, with the disqualified juror, Waddell, sitting on the jury. This was no helter-skelter defense but was active and strenuous. I am convinced that, on this record, Conaway and his attorneys suffered Waddell to be on the jury and cannot now take advantage of any error relating to his sitting.