**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-7**

ANTHONY BERNARD JUNIPER,

Petitioner-Appellant,

v.

DAVID W. ZOOK, Warden, Sussex I State Prison,

Respondent-Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  John A. Gibney, Jr., District Judge.  (3:11-cv-00746-JAG)

Argued:  September 15, 2017                    Decided:  November 16, 2017

Before GREGORY, Chief Judge, WYNN and DIAZ, Circuit Judges.

Vacated in part and remanded by published opinion.  Judge Wynn wrote the opinion, in which Chief Judge Gregory and Judge Diaz concurred.

**ARGUED:** Dawn Michele Davison, VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER, Charlottesville, Virginia, for Appellant.  Matthew P. Dullaghan, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee. **ON BRIEF:** Elizabeth Hambourger, Johanna Jennings, CENTER FOR DEATH PENALTY LITIGATION, Durham, North Carolina, for Appellant.  Robert E. Lee, Jr., VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER, Charlottesville, Virginia, for Appellant.  Mark R. Herring, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.

WYNN, Circuit Judge:

Following a bifurcated jury trial in the Circuit Court, City of Norfolk, Virginia, a jury convicted and sentenced to death Petitioner Anthony Juniper ("Petitioner") for the January 16, 2004 murders of Keshia Stephens, her younger brother Rueben Harrison, and her two daughters Nykia Stephens and Shearyia Stephens. After unsuccessfully pursuing collateral relief from his conviction and death sentence in Virginia courts, Petitioner filed an action under 28 U.S.C. § 2254 in the U.S. District Court for the Eastern District of Virginia against Respondent David W. Zook, in his official capacity as Warden, Sussex I State Prison ("Respondent"). Before the district court, Petitioner asserted numerous bases for relief, including that his prosecutors failed to turn over certain pieces of "material" exculpatory and impeaching evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The district court granted Petitioner limited documentary discovery, denied Petitioner's request for an evidentiary hearing, and rejected all of Petitioner's claims and dismissed his petition.

After conducting a careful review of the record, we conclude that the district court abused its discretion in dismissing Petitioner's *Brady* claim without holding an evidentiary hearing because it failed to assess the plausibility of that claim through the proper legal lens. Accordingly, we vacate the district court's decision as to the *Brady* claim and remand the case to the district court for further proceedings consistent with this opinion.[1]

---

[1] Petitioner obtained a certificate of appealability as to three additional claims. The first and second claims, which Petitioner raised pursuant to the Supreme Court's opinion in *Martinez v. Ryan*, 566 U.S. 1 (2012), asserted (1) that Petitioner's state trial counsel

2

I.

A.

According to the evidence presented at trial, Petitioner and Keshia Stephens had

been involved "in an on-again, off-again tumultuous relationship for approximately two

years." *Juniper v. Commonwealth*, 626 S.E.2d 383, 394 (Va. 2006). On the morning of

the murders, Renee Rashid, who testified under a grant of immunity, took Petitioner to

Keshia's apartment to retrieve some of his belongings. Rashid and Petitioner arrived at the

apartment, which was on the second floor of a building in Norfolk, Virginia, at

approximately 10:20 a.m. While in the apartment, Rashid heard Petitioner and Keshia

arguing, with "Keshia repeatedly ma[king] comments such as, '[T]here's nobody but you.

I told you I'm not seeing anybody but you.'" *Id.* at 393. Rashid left the apartment, and

Petitioner remained behind. Rashid testified that as she drove away, "she heard four

'booms,' which she described as 'sound[ing] like gunshots.'" *Id.*

---

failed "to properly challenge the prosecutor's violation of *Batson v. Kentucky*, 476 U.S. 79 (1986)," *Juniper v. Zook*, 117 F. Supp. 3d 780, 787 (E.D. Va. 2015), and (2) that his state trial counsel failed "to make a constitutional objection to the trial court's exclusion of expert testimony on [Petitioner's] future dangerousness," *id.* The final claim alleged that Petitioner's appellate counsel failed to appeal an objection that the jury instructions did not require the jury to find each aggravating factor unanimously and beyond a reasonable doubt. *Juniper v. Pearson*, No. 3:11–cv–00746, 2013 WL 1333513, at *43 (E.D. Va. March 29, 2013), *vacated in part sub nom. Juniper v. Davis*, 737 F.3d 288 (4th Cir. 2013). Because we conclude the district court improperly dismissed Petitioner's *Brady* claim without holding an evidentiary hearing, we decline to resolve Petitioner's remaining three claims as those claims would be moot if the district court rules in Petitioner's favor on the *Brady* claim and awards Petitioner a new trial.

Rashid drove to the house of Gwendolyn Rogers, Petitioner's mother, where she met Rogers and Keon Murray, a friend of Petitioner. Murray, also testifying under a grant of immunity, said that while at Rogers's house he received a call from Petitioner, which originated from Keshia's phone number. According to Murray's testimony, Petitioner told Murray over the phone that "They gone," and that Petitioner "killed them," but did not name whom he had killed. *Id.* at 395.

Murray then called his friend Tyrone Mings, a twice-convicted felon who lived with his girlfriend, Melinda Bowser, one block from Keshia's apartment building. According to Mings's testimony, Murray asked Mings to check on Keshia's apartment because "[Murray] heard some shots." J.A. at 412. Some time later, Mings walked down the street to Keshia's apartment and found that Keshia's front door appeared to have been "kicked in." *Juniper*, 626 S.E.2d at 395.

> Upon entering Keshia's apartment, Mings testified that he saw [Petitioner] standing in the living room with a white substance on his face and holding an automatic pistol. When Mings asked [Petitioner] about Keshia, [Petitioner] directed Mings to the back of the apartment. Upon entering the master bedroom, Mings saw Rueben and a young girl lying on the bed. Mings did not see Keshia and asked [Petitioner] where she was. [Petitioner] told Mings she was "between the bed and the dresser." Mings returned to the bedroom and called to the people in the room, but no one answered. Mings departed Keshia's apartment, leaving [Petitioner] in the living room, still holding the pistol.

*Id.* Mings testified that he then returned to his apartment and told Bowser what he had seen at Keshia's apartment.

Meanwhile, according to Rashid's and Murray's testimony, Rashid and Murray left Rogers's apartment in Rashid's car, picked up Petitioner's cousin, John Jones, and

4

proceeded to Keshia's apartment building. While Rashid waited in the car, Murray and Jones got out of the car and searched for Petitioner. Jones called out several times for Petitioner to "[c]ome out." J.A. 406. Petitioner came down to the car and got into the passenger seat, beside Rashid. Murray and Jones got in the back seats. Both Rashid and Murray testified that Petitioner was holding a handgun when he got in the car. *Id.* at 390, 408. Rashid further testified that Petitioner "appeared to be jittery" and "was breathing real hard." *Id.* at 389. And according to Murray, Petitioner "look[ed] nervous." *Id.* at 407.

After telling Bowser what he had seen, Mings walked back from his apartment toward Keshia's apartment. Mings testified that while he was walking to Keshia's apartment, he saw Petitioner, Murray, and Jones leaving Keshia's apartment. Mings then observed Petitioner, Murray, and Jones get into a car, which was driven by "a female," and drive off. *Id.* at 415-17. At that point, Mings walked back to his apartment. Mings testified that when he returned to his apartment, Bowser called the police. At trial, a Norfolk Police officer testified that at 12:44 p.m. he responded to a call reporting a disturbance and possible gunshots at Keshia's apartment. The officer, who was later joined by another officer, walked around the complex, talked to two residents, and, finding nothing troubling, "left the apartment complex believing the call to have been a false report." *Juniper*, 626 S.E.2d at 395.

Meanwhile, Rashid drove Petitioner and Jones to Jones's apartment, and then returned to her own apartment. Rashid testified that, after arriving at home, she called Petitioner's mother. Phone records introduced at trial established that this call occurred at 1:10 p.m.

5

In the meantime, Mings walked back to Keshia's apartment a third time, this time accompanied by Bowser. On the way to her apartment, Mings and Bowser saw the officers who had responded to the 12:44 p.m. call leave. Mings and Bowser returned to their apartment, and Bowser called the police a second time. At approximately 2:20 p.m., a large number of Norfolk Police Department officers responded to a second call regarding a disturbance at Keshia's apartment. Mings and Bowser were waiting outside the apartment when the officers arrived. Mings testified that he told the officers there were victims inside, but did not tell the officers that he had observed Petitioner inside the apartment with a gun because Mings "feared for [his] safety." J.A. 419.

One of the officers who responded to the 2:20 p.m. call testified that, when he reached the front door of Keshia's apartment, the "whole center part of the door was completely knocked . . . inward into the apartment, and wooden debris from the door was lying inside the apartment." *Juniper*, 626 S.E.2d at 395. Upon entering the apartment, officers found

> Nykia's body lying across Rueben on the bed in the master bedroom. They then observed Shearyia's body lying across Keshia's body on the floor beside the bed. The officers received no response from any of them. . . .
>
> All four victims . . . died as a result of gunshot wounds. Keshia was stabbed through her abdomen, shot three times, and grazed by a fourth bullet. . . . The stab wound did not fatally wound Keshia, but tore through the muscle of her abdominal wall. There was a great deal of blood accompanying the wound, however, which led the medical examiner performing the autopsy to conclude that the stab wound was probably the first injury inflicted on Keshia. . . . Two-year old Shearyia was shot four times while in her mother's arms. . . . Rueben Harrison was shot three times. . . . Four-year old Nykia was shot one time behind her left ear.

*Id.* at 394–95.

6

At the crime scene, police officers found the handle and blade of a steak knife, which originally were joined. According to expert testimony, the "stab wound was consistent with a wound that would have been caused by the knife blade found at the scene of the crime." *Id.* at 394. Investigators found Petitioner's latent thumbprint on the part of the knife blade nearest the handle, and Petitioner's DNA on the knife handle. Investigators also found a cigarette butt bearing Petitioner's DNA at the threshold of the apartment.

Although law enforcement officers never recovered the firearm used to kill the victims, a firearms expert concluded "the bullets recovered from the victims' bodies were fired from a single nine-millimeter, Luger semi-automatic pistol." *Id.* at 395. At the crime scene, law enforcement officers found an ammunition box that contained the type of bullets used to kill the victims, as well as a number of cartridges and cartridge casings. Although the investigators did not identify any prints of value on the cartridges or cartridge casings, they did find a print of value on the ammunition box. Investigators could not identify to whom the print on the ammunition box belonged, but concluded it was not Petitioner. On the bed in the master bedroom, beside the victims, law enforcement officers found an ashtray with a cigarette butt. DNA found on the cigarette butt belonged to an "unknown individual," not Petitioner nor any of the victims. J.A. 385.

B.

On April 7, 2004, a grand jury indicted Petitioner for capital murder, use of a firearm in commission of a felony, and statutory burglary. A jury convicted Petitioner of four counts of capital murder, statutory burglary while armed with a deadly weapon, and four

7

counts of use of a firearm in commission of a felony. *Juniper*, 626 S.E. 2d at 393. Following a separate sentencing hearing, the jury sentenced Petitioner to death.

Petitioner directly appealed his conviction and death sentence to the Supreme Court of Virginia, asserting numerous grounds for relief. Finding no reversible error, the Supreme Court of Virginia affirmed Petitioner's conviction and sentence on March 2, 2006. *Id.* at 427–28.

On December 11, 2006, Petitioner filed a petition for state collateral relief. The 120-page petition exceeded the relevant 50-page limit, and Petitioner concurrently filed a motion for relief from the page limitation. The Supreme Court of Virginia denied Petitioner relief from the page limit and directed Petitioner to refile his petition in compliance with the 50-page restriction. Petitioner refiled his state collateral relief petition on March 2, 2007, alleging, among other claims, that the prosecution failed to turn over material exculpatory evidence, that the prosecution failed to correct testimony it knew to be false, and that he was denied effective assistance of trial counsel. Petitioner also twice moved the court to permit additional factual development, specifically requesting, among other materials, that the court "order the Commonwealth to provide habeas counsel copies of all taped, typed, or otherwise memorialized interviews or statements taken in connection with investigating [Petitioner in] the above-captioned case." J.A. 746. Respondent opposed Petitioner's request for discovery, twice representing that Petitioner "was provided everything required by law[.]" *Id.* at 682, 764. On March 4, 2011, the Supreme Court of Virginia denied Petitioner's request for additional factual development and

dismissed his habeas petition. *Juniper v. Warden of Sussex I State Prison*, 707 S.E.2d 290, 311 (Va. 2011).

In 2011, the lead investigator in Petitioner's case, Detective R. Glenn Ford, was federally prosecuted for and convicted of taking bribes from drug defendants in exchange for falsely representing to judges and prosecutors that those defendants had cooperated in homicide investigations. During that prosecution, it was revealed that investigative notes maintained by Ford related to Petitioner's case had not been turned over to Petitioner's trial counsel. Among several pieces of allegedly exculpatory information included in the investigative notes, the notes stated that, in the immediate aftermath of the murders, investigators interviewed one of Keshia's neighbors, Wendy Roberts, and asked her to view a photo line-up. Petitioner's trial counsel did not know that Wendy had discussed Petitioner's case with investigators.

Investigators assisting in Petitioner's habeas proceedings approached Wendy, who provided an affidavit averring that the night before the murders she heard a man and woman arguing in Keshia's apartment. She heard arguing again the following morning. And then in the afternoon, as she was taking her dog outside, she heard "a series of loud pops." J.A. 885. Soon after, a man came down the stairs from Keshia's apartment and told Wendy "What the fuck are you looking at lady?" *Id.* at 886. The man then got into an "older" "large four-door car" (not a truck, van, or SUV) and drove off. *Id.* Wendy stated that the man, who was one of three African-American men who regularly visited Keshia's apartment, was the only person in the car. Wendy further averred that this occurred

9

sometime between 1:00 and 2:30 p.m. and approximately five minutes before a large number of police officers arrived.

Wendy's son, Jason, also provided an affidavit to Petitioner's habeas investigators. Jason, who lived with Wendy at the time of the murders, averred that he heard "gunshots" and looked out his window and saw an African-American man running to a car parked in front of Keshia's building. *Id.* at 888. Jason said he immediately ran outside and saw the man get into the driver's seat of the car and drive off. According to Jason, within five minutes, approximately thirteen police officers arrived.

Attaching the Roberts's affidavits and the investigative notes, Petitioner filed with the Supreme Court of Virginia a new motion seeking factual development related to the newly uncovered evidence. Petitioner's motion specifically sought, among numerous requests:

> All documents, reports, records, notes, memoranda, and recordings of whatever sort and in whatever meeting medium of meetings and contact between law enforcement authorities for the Commonwealth (including prosecutors, police, and agents or representatives of the Commonwealth) and Melinda Bowser, Tyrone Mings, Kevin Waterman, Wendy Roberts, Jason Roberts, Bernadette Patterson, John Jones, Jr., Sharon Louise Shell, Derrick 'Breon' Banks, Renee Rashid, Keon Murray, and Carlisha Stephens, that in any way involved the investigation or prosecution of [Petitioner] for murder, capital murder, or related offenses.

*Id.* at 920. Respondent opposed Petitioner's request for additional factual development, arguing that the motion was untimely and that Petitioner's "assertion of a *Brady* violation is without merit." *Id.* at 890–91. Petitioner also filed a second petition with the Supreme Court of Virginia seeking collateral relief from his conviction based on the newly uncovered information. The Supreme Court of Virginia denied the second petition on the

10

ground that it was not timely filed and denied the request for additional factual development.

On January 30, 2012, having exhausted his state remedies, Petitioner filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 in the U.S. District Court for the Eastern District of Virginia. The federal habeas petition asserted many of the same bases for relief as Petitioner's state habeas petitions, and also asserted a claim under *Brady* related to the withheld Roberts evidence. Petitioner sought extensive discovery related to the information revealed in the withheld investigative notes. Respondent opposed Petitioner's request for discovery and moved to dismiss the petition. In opposing Petitioner's request for discovery, Respondent again represented that Petitioner "received all the discovery that state and constitutional law required at his trial." Warden's Opp. to Pet'r's Mem. in Supp. of Mot. for Leave to Conduct Disc., *Juniper v. Pearson*, No. 3:11-cv-746, at 4 (E.D. Va. Aug. 6, 2012), ECF No. 64.

After initially denying Petitioner's discovery request in its entirety, the district court granted Petitioner limited documentary discovery regarding the Roberts's statements to investigators. In particular, the district court ordered production of the following documents:

1. Notes, reports, and memoranda—whether handwritten, typed, dictated, or transcribed—relating to or including information about conversations between the Norfolk Police Department and Wendy Roberts or Jason Roberts on or about January 16-17, 2004.

2. Notes, reports, and memoranda—whether handwritten, typed, dictated, or transcribed—from the Norfolk Police Department officers who showed Wendy and Jason Roberts a photo lineup at their home on January 17, 2004, or were present when they viewed that photo lineup, regarding this interaction with them.

11

3. The photo lineup shown to Wendy and Jason Roberts on January 17, 2004, along with the names and identifying information of each person whose photograph was included in the lineup.

4. Any memoranda, letters, or notes—whether handwritten, typed, dictated, or transcribed—between the Norfolk Police Department personnel and the Norfolk Commonwealth Attorney's Office regarding Wendy and Jason Roberts, the photo lineup they viewed, statements they made, and conversations they had with Norfolk Police Department personnel.

J.A. 1147.

In response to the district court's discovery order, the State produced three pages of typed investigative notes from Petitioner's case, a six-picture photo array, and sworn affidavits from Deputy Commonwealth's Attorney Phillip G. Evans II, who handled Petitioner's case at trial, and Detective William A. Conway of the Norfolk Police Department, who participated in the investigation of the Stephens's murders. Two pages of the typed notes were excerpted from the investigative notes Petitioner had already obtained as a result of Ford's criminal trial. The final page of notes was purportedly prepared by Investigator D.I. Jones, who worked in the Norfolk Police Department's Forgery Unit and also responded to the Stephens's murders. Investigator Jones's notes reported that he interviewed Wendy and Jason Roberts on the day of the murders, who, according to the notes, stated as follows:

> Ms. Roberts stated that on 1-16-04 about 9:30 to 10AM a B/M in an older red Toyota pulled into the apt lot and was arguing with a B/F. She stated that they argue about three or four times a week. She thinks he is an ex-boyfriend. He came back around 12:30 or 12:45 today and they were arguing again. She heard the B/M tell the female that she had not better be there when he returned. About 1:30 PM today she heard what she thought was firecrackers. She said it was three or four bangs. She said the female moved into apt 1 around Christmas time. She said the B/M comes around in the Toyota all hours of the day and night and beeps the horn for her. He comes around the

12

apt about 7:30 AM each morning wanting to see the kids. She said the male is about 6-2 150 lbs late 20's in an older red Toyota like a Corolla.[2] The female is small 5-1 in her 20's.[3] There is also another B/M that drives a older blue and white Ford 150 with a white camper shell that also goes to the apt. He is a very large fat guy. Jason was not home at the time of the argument, but has seen the people and the vehicles many times. He also heard the bangs when he got home and thought it was someone hammering. Both will call if they see the vehicles and will write down the license plates. The[y] believed there were 3 children that lived there, but they were not sure.

*Id.* at 1161. According to the investigative notes revealed in Ford's trial, on the night of the murders Ford and Detective Conway "spoke with Wendy Roberts, whose statement was consistent with that of the interview given to Detective D.I. Jones." *Id.* at 1162. Deputy Commonwealth's Attorney Evans's and Detective Conway's affidavits highlighted several inconsistencies between Jones's notes and Wendy's 2011 affidavit, and Detective Conway further averred that the "2011 Affidavit included numerous assertions which she never said to me on January 17, 2004[.]" *Id.* at 1175.

Deputy Commonwealth's Attorney Evans's and Detective Conway's affidavits stated that the State could not confirm that the six-photo array, which included Petitioner, was the array shown to Wendy on the day of the murders, but that the array was in the State's file and resembled the black-and-white array Detective Conway recalled showing

---

[2] At the time of the murders, Petitioner was 6-1, weighed over 300 pounds, and did not drive a Toyota.

[3] Wendy's description of the black female resembled Keshia. *Juniper*, 2013 WL 1333513, at *14 n.8 (noting that Wendy's description of the black female was "similar" to appearance of Keshia and that Keshia moved into the apartment at the time Wendy said the black female moved into the apartment).

to Wendy on the night of the murders.[4]  According to the investigative notes, Wendy, although not "100 percent sure[,] . . . picked out the lower left" photo, which was not Petitioner.  *Id.* at 1163.

Deputy Commonwealth's Attorney Evans's affidavit also described the prosecution's rationale for not disclosing the Roberts materials to Petitioner's trial counsel before trial.  According to Deputy Commonwealth's Attorney Evans, a 911 chronology— which, according to Petitioner, the prosecution also did not disclose to Petitioner's trial counsel—coupled with Mings's trial testimony that Petitioner committed the murders before Mings first called 911, "clearly proved that the murders of the four victims occurred prior to the first Norfolk Police Department response initiated at 12:44 p.m. on January 16, 2004."  *Id.* at 1156.  Deputy Commonwealth's Attorney Evans's affidavit further maintained that the Roberts materials were not "material[ly]" exculpatory—and thus not subject to disclosure under *Brady*—because (1) "Wendy Roberts' statements on January 16, 2004 were factually inconsistent with the documented event chronology of the Norfolk Police Department response and activities in and around [Keshia's apartment] on January 16, 2004" and (2) "[t]he objective record to include the 911 calls [Event Chronology] and the eyewitness statements [memorialized on the 911 calls] proves that the murders did not occur at 1:30 p.m. [Roberts's statement in 2004] or 'between 1:00 p.m. and 2:00 p.m.' [per

---

[4] Petitioner subsequently amended his petition to assert a claim under *California v. Trombetta*, 467 U.S. 469 (1984), premised on the government's failure to preserve evidence establishing whether the line-up was the one in fact shown to Wendy.  It is unclear from the record whether the district court resolved that claim.

Roberts' 2011 Statement]." *Id.* at 1159–60 (final four bracketed phrases retained). Deputy Commonwealth's Attorney Evans and Detective Conway further averred that, based on a thorough review, the documents produced in response to the district court's order were all documents in the Commonwealth's files responsive to the order.

After receiving the additional materials, Petitioner moved the district court for leave to conduct additional documentary and deposition discovery, asserting that "the affidavits and attached exhibits raise additional questions" warranting such discovery. *Id.* at 1195. Respondent again opposed further discovery. The district court denied Petitioner's request for additional discovery on March 12, 2013.

On March 23, 2013, the district court denied Petitioner's Section 2254 petition in its entirety. *Juniper*, 2013 WL 1333513, at *1. Regarding the *Brady* claim premised on the Roberts materials, in particular, the district court concluded that the Roberts materials were exculpatory and impeaching and improperly withheld, but nonetheless denied Petitioner relief because it concluded that the Roberts materials failed to satisfy *Brady*'s "materiality" requirement. *Id.* at *14–17. In reaching its decision, the district court elected not to hold an evidentiary hearing on grounds that the facts alleged by Petitioner were insufficient, even if proven true, to entitle Petitioner to relief. *Id.* at *16 n.10. The district court granted a certificate of appealability as to Petitioner's *Brady* claim related to the withheld Roberts statements.

## II.

On appeal, Petitioner argues that the district court erred in dismissing on the merits his *Brady* claim premised on the withheld Roberts materials, or, in the alternative, that the

15

district reversibly erred in dismissing the *Brady* claim without conducting an evidentiary hearing and allowing further factual development. For the reasons that follow, we conclude that the district court reversibly erred in ruling on the merits of Petitioner's *Brady* claim without holding an evidentiary hearing, and therefore do not reach Petitioner's contention that the district court incorrectly denied that claim on the merits.

A.

We review a district court's decision to deny a habeas petitioner an evidentiary hearing for abuse of discretion. *Conaway v. Polk*, 453 F.3d 567, 582 (4th Cir. 2006). "In conducting such a review, we are mindful that, by definition, a court abuses its discretion when it makes an error of law." *Id.* (internal quotation marks and alterations omitted). "A petitioner who has diligently pursued his habeas corpus claim in state court is entitled to an evidentiary hearing in federal court, on facts not previously developed in the state court proceedings, if the facts alleged would entitle him to relief, and if he satisfies one of the six factors enumerated by the Supreme Court in *Townsend v. Sain*, 372 U.S. 293, 313 (1963)."[5] *Id.*

---

[5] The six *Townsend* factors are:

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

16

A petitioner diligently has pursued his habeas claim in state court if he "'made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court.'" *Id.* at 589 (quoting *Williams (Michael) v. Taylor*, 529 U.S. 420, 435 (2000)). "At a minimum, a diligent petitioner must 'seek an evidentiary hearing in state court in the manner prescribed by state law.'" *Id.* (quoting *Williams*, 529 U.S. at 437)). "Importantly, . . . in determining whether a petitioner has been diligent, the question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts." *Wolfe v. Johnson*, 565 F.3d 140, 167 (4th Cir. 2009) ("*Wolfe I*") (internal quotation marks omitted). Under this standard, Petitioner diligently pursued in state court his *Brady* claim premised on the withheld Roberts statements. In particular, Petitioner repeatedly requested that the Commonwealth turn over all records related to its investigation of his role in the Stephens's murders, including notes and summaries of potential witnesses, like the Roberts. And after obtaining the investigative notes revealed in Ford's trial, Petitioner unsuccessfully sought to reopen his state habeas proceedings and specifically requested further discovery and an evidentiary hearing related to the Roberts materials, only to have those requests denied on timeliness grounds.

The parties also do not dispute that Petitioner can satisfy at least one of the six factors set forth in *Townsend*. Specifically, state courts did not afford Petitioner the opportunity to develop the facts underlying his *Brady* claim premised on the withheld Roberts materials and dismissed the claim without addressing the merits. *See Conaway*,

---

*Townsend*, 372 U.S. at 313.

17

453 F.3d at 590 (holding fifth *Townsend* factor satisfied when the petitioner had "never been afforded an opportunity to develop the facts underlying the Juror Bias claim"); *see also Wolfe I*, 565 F.3d at 170–71 (stating that habeas petition asserting *Brady* claim premised on exculpatory and impeachment evidence withheld by prosecution likely satisfied the first, fourth, and fifth *Townsend* factors).

The key question, therefore, is whether Petitioner has alleged facts sufficient to obtain relief under Section 2254. *Conaway*, 453 F.3d at 582. We evaluate the sufficiency of Petitioner's factual allegations "pursuant to the principles of Federal Rule of Civil Procedure 12(b)(6)." *Wolfe I*, 565 F.3d at 169. Under that standard, we determine whether the petition "states 'a claim to relief that is plausible on its face.'" *United States ex rel. Oberg v. Penn. Higher Educ. Assist. Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). "In doing so, we construe facts in the light most favorable to the plaintiff . . . and draw all reasonable inferences in his favor." *Id.* (internal quotation marks omitted); *Wolfe I*, 565 F.3d at 169 ("[U]nder the Rule 12(b)(6) standard, the court is obligated to assume all facts pleaded by the § 2254 petitioner to be true." (internal quotation marks and alterations omitted)).

To prevail on his *Brady* claim, Petitioner must establish: (1) "[t]he evidence at issue [is] favorable to [Petitioner], either because it is exculpatory, or because it is impeaching;" (2) "that evidence [was] suppressed by the State, either willfully or inadvertently;" and (3)

18

"prejudice [] ensued.'" *Banks v. Dretke*, 540 U.S. 668, 691 (2004).[6] The district court concluded—and we agree—that Petitioner alleged sufficient facts to "meet[] the first prong of the *Brady* test without any difficulty." *Juniper*, 2013 WL 1333513, at *15. In particular, the Roberts materials were exculpatory because, among other reasons, by indicating that Keshia was alive at 12:30 p.m., they "contradict[ed]" the prosecution's theory that the murders occurred at 11:45 a.m.; they "peg[ged] the murders to a time when the prosecution's eyewitnesses all claimed [Petitioner] had already fled the scene"; and they identified an alternative perpetrator who bore no resemblance to Petitioner, "drove a car that obviously did not belong to [P]etition[er]," and "may have been angry with Stephens, and even threatened her not to stay on the premises any longer, just hours before someone killed her." *Id.* at *14–15. Likewise, we agree with the district court that Wendy's identification of someone other than Petitioner in the photo array was exculpatory because "[a]n eyewitness account pointing to a different suspect undoubtedly constitutes

---

[6] Respondent asserts that Petitioner procedurally defaulted his *Brady* claim because the Supreme Court of Virginia dismissed Petitioner's second petition, which raised that claim, as untimely. "Under the well-established doctrine of procedural default, a federal habeas court may not review a claim that a state court has found to be clearly and expressly defaulted under an independent and adequate state procedural rule unless the prisoner can demonstrate [1] cause for the default and [2] prejudice resulting therefrom or demonstrate that a failure to consider the claims will result in a fundamental miscarriage of justice." *Weeks v. Angelone*, 176 F.3d 249, 269 (4th Cir. 1999). The Supreme Court, however, has recognized that the "cause" and "prejudice" requirements to excuse a procedural default "'parallel two of the three components of the *Brady* violation itself'"—"suppress[ion]" of evidence amounts to "cause" and the materiality requirement addresses "prejudice." *Banks*, 540 U.S. at 691 (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). Accordingly, if Petitioner succeeds on his *Brady* claim he "necessarily" meets the requirement to excuse his procedural default. *Wolfe v. Clarke*, 691 F.3d 410, 419–20 (4th Cir. 2012) ("*Wolfe II*").

19

exculpatory material." *Id.* at *15; *see also, e.g.*, *Hart v. Mannina*, 798 F.3d 578, 588 n.1 (7th Cir. 2015) ("Whether recorded or not, any time a witness is presented with a photo array, is asked to identify a suspect, and then fails to identify the suspect, if anyone in the photo array is later prosecuted, he will be entitled under *Brady* . . . to know about the non-identification.").

The district court also correctly determined that the Roberts materials were impeaching. As the district court explained, "if Roberts saw Stephens alive [at 12:30 to 12:45 p.m.], such an observation would have impeached Tyrone Mings' testimony about going to the apartment, seeing the petitioner with a gun after he committed the murders, and seeing petitioner gesturing to Stephens' dead body[.]" *Juniper*, 2013 WL 1333513, at *14. Roberts's statement that Keshia was alive at 12:30 and that she heard sounds resembling gunshots later in the afternoon also would cast doubt on Rashid's testimony that she heard gunshots as she left the apartment earlier in the morning and Murray's testimony that, in the morning phone call, Petitioner admitted to committing the murders. *Id.* Put simply, "the Roberts' 2004 eyewitness accounts, as memorialized by D.I. Jones' typed notes and confirmed by Detectives Conway and Ford in their interview of Wendy Roberts, flatly contradicted those of the prosecution's key witnesses: Rashid, Mings, and Murray." *Id.*

Regarding the second *Brady* element—suppression—the district court held that "the record before the Court compels the conclusion that the prosecution did not give the defense information about the Roberts[,]" noting that "[t]he Court has seen no sign in the voluminous record that the Roberts' names came up before the police corruption

20

prosecution." *Id.* at *15. The district court further stated that if, as Respondent maintained before the district court,

> it is "highly likely that the prosecutor did provide the information to [Petitioner's] trial counsel," then why has [Respondent], throughout years of habeas proceedings steadfastly opposed production of the documents when [P]etitioner's habeas counsel has sought them? If prosecutors had already shared the documents with trial counsel, what is it precisely that the Commonwealth and its various representatives have been so desperate to protect, and for what reason? The events leading up to this point, far from demonstrating a lack of concealment, show the Commonwealth's entrenched resistance to transparency in this criminal prosecution and subsequent post-conviction proceedings.

*Id.* We agree with this analysis, and note that additional evidence in the record before the district court pointed to suppression. For example, Deputy Commonwealth's Attorney Evans asserted in his affidavit that he did not believe the Roberts materials were subject to disclosure under *Brady* because the Roberts's statements were "factually inconsistent" with the prosecution's conclusion, based on the time of the first 911 call and Mings's testimony that murders occurred prior to the first 911 call. J.A. 1159–60. But the "factual inconsisten[cy]" between the Roberts materials and the statements of the first 911 caller and Mings is precisely what renders the Roberts materials exculpatory and impeaching for purposes of *Brady*. *See, e.g.*, *Williams v. Ryan*, 623 F.3d 1258, 1265 (9th Cir. 2010) (holding that prosecution violated *Brady* by failing to disclose evidence "inconsistent with the State's theory at trial"); *United States v. Tavera*, 719 F.3d 705, 708 (6th Cir. 2013) (holding that prosecution violated *Brady* by failing to disclose statements to prosecutor that "directly contradicted the story of the government's main witness"); *Mendez v. Artuz*, 303 F.3d 411, 414 (2d Cir. 2002) ("Suppressed information is exculpatory and thus 'favorable'

21

to the defense for *Brady* purposes when it directly contradicts the motive theory testified to by prosecution witnesses."); *United States v. Zuazo*, 243 F.3d 428, 431 n.2 (8th Cir. 2001) (explaining that evidence is exculpatory for purposes of *Brady* if it "contradict[s] the government's theory of guilt"). That Petitioner's prosecutor seems to have fundamentally misunderstood his obligation under *Brady* provides further grounds to conclude that the prosecution suppressed the Roberts materials, and potentially other exculpatory or impeaching evidence.[7] And Ford's subsequent conviction for accepting bribes and making false representations to courts only enhances the plausibility of improper suppression.

Although the district court concluded that the Roberts materials were exculpatory and impeaching and suppressed, the court nonetheless denied Petitioner relief on grounds that Petitioner failed to establish the third *Brady* element—"material[ity]" of the withheld Roberts materials—the element to which we now turn. *Juniper*, 2013 WL 1333513, at *17.

---

[7] We have repeatedly rebuked the Commonwealth's Attorney and his deputies and assistants for failing to adhere to their obligations under *Brady*. *See Wolfe II*, 691 F.3d at 423 ("lambast[ing]" Assistant Commonwealth's Attorney for "not produc[ing] evidence to a criminal defendant unless he first deems it to be 'material[]' and credib[le]"); *Muhammad v. Kelly*, 575 F.3d 359, 370 (4th Cir. 2009) (refusing to "condone" suppression of exculpatory and impeaching evidence by prosecution, notwithstanding that such evidence was not material, because "[a]s a matter of practice, the prosecution should err on the side of disclosure, especially when a defendant is facing the specter of execution"). We find it troubling that, notwithstanding these rebukes, officials in the Commonwealth's Attorney's office continue to stake out positions plainly contrary to their obligations under the Constitution.

B.

The Supreme Court has held that suppressed, exculpatory evidence is "material" if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). Put differently, to establish materiality, a petitioner must show that "'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Strickler v. Greene*, 527 U.S. 263, 289 (1999). Under this standard, "[t]he question is *not* whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434 (emphasis added). Likewise, the materiality inquiry "is not a sufficiency of the evidence test[,]" and therefore "[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would have been enough left to convict." *Id.* at 434–35. Additionally, withheld evidence should be "considered collectively, not item by item." *Id.* at 436–37.

Applying this test, the district court concluded that Petitioner failed to plausibly allege that the withheld Roberts evidence was material because that evidence "cannot unsettle certain basic facts about the murders." *Juniper*, 2013 WL 1333513, at *17. In particular, the district court emphasized that Petitioner's DNA and thumbprint were on the handle and blade, respectively, of the knife used to stab Keshia. *Id.* And the district court pointed out that the first 911 call reporting shots at Keshia's apartment was registered at 12:44 p.m., a fact which "cannot [be] unsettle[d]" by other witnesses' testimony that they

23

heard shots later. *Id.* at *18. Finally, the court stated that Petitioner's "conduct and statements after the killings are additional strong evidence of his guilt." *Id.*

The district court did not apply the proper legal standard in determining whether Petitioner alleged or established sufficient facts regarding materiality to warrant an evidentiary hearing. We reach this conclusion for several reasons. First, the district court failed to "construe facts in the light most favorable to the plaintiff . . . and draw all reasonable inferences in his favor." *Oberg*, 745 F.3d at 136 (internal quotation marks omitted). For example, the district court said it "stretches the imagination" to believe that the person the Roberts saw leaving Keshia's apartment between 1:00 and 2:30 p.m. was the murderer or also involved in the murders because the police received the first call reporting gunshots at Keshia's apartment at 12:44 p.m. *Juniper*, 2013 WL 1333513, at *17. But as described in the petition and further detailed in the 911 "Event Chronology" produced in response to the district court's discovery order, the officers who responded to the 12:44 p.m. call surveyed the complex and spoke with the residents of the apartment below Keshia's who reported that they "did not hear any gun shots." J.A. 1003, 1166. The officers, therefore, concluded the call to be a false report. And the petition alleged that at least three disinterested witnesses—Wendy and Jason Roberts and Kevin Waterman— heard sounds resembling gunshots after 1:00 p.m. *Id.* at 997–98. Additionally, in a fact not mentioned in the district court's materiality analysis, Investigator Jones's notes of Wendy Roberts's statement on the day of the murders reported that she saw a woman resembling Keshia alive and arguing with a black male who was not Petitioner between 12:30 and 12:45 p.m. Viewing these facts in the light most favorable to Petitioner, the

24

murders plausibly occurred after 1:00 p.m., at the time the Roberts saw the unidentified individual fleeing Keshia's apartment.

Second, the district court failed to properly account for the impeachment value of the withheld Roberts statements. In determining whether "'there is a reasonable probability' that the result of the trial would have been different[,]" *Strickler*, 527 U.S. at 289, a court must consider "the aggregate effect that the withheld evidence would have had if it had been disclosed[,]" *Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1347 (11th Cir. 2009). In order to determine "the aggregate effect" of the withheld evidence, the court must *both* "add[] to the weight of the evidence on the defense side . . . all of the undisclosed exculpatory evidence" *and* "subtract[] from the weight of the evidence on the prosecution's side . . . the force and effect of all the undisclosed impeachment evidence." *Id.*

Here, the district court failed to "subtract" from the weight of the evidence on the prosecution's side the "force and effect" of the impeachment value of the withheld Roberts materials. In particular, notwithstanding the district court's conclusion that the Roberts's 2004 statements "flatly contradicted those of the prosecution's key witnesses: Rashid, Mings, and Murray," *Juniper*, 2013 WL 1333513, at *14, the district court nonetheless relied on Rashid's, Mings's, and Murray's testimony to hold that the withheld evidence was not material. For example, the district court appealed to Petitioner's "conduct and statements after the killings [as] additional strong evidence of his guilt," even though the testimony regarding Petitioner's incriminating conduct and statements came from Rashid, Mings, and Murray. *Id.* at *17. Likewise, the district court relied on the first 911 caller's report of hearing gunshots at Keshia's apartment an hour earlier as definitive evidence that

25

the murders occurred before 1:00 p.m. *Id.* However, according to the facts adduced at trial, the petition, and Deputy Commonwealth Attorney Evans's affidavit, that call was made by Bowser, who did not personally hear the alleged gunshots, but instead had received the information fourth-hand—*i.e.*, through Mings by way of Murray, who in turn relied on Rashid's statement that she had heard gunshots when she left Keshia's apartment earlier in the morning. And again, Rashid's, Mings's, and Murray's testimony was subject to impeachment by the Roberts's statements. The district court, therefore, improperly failed to "subtract" the full force and effect of the impeachment value of the withheld Roberts evidence. *Smith*, 572 F.3d at 1347.

Third, the district court improperly made credibility determinations based on the written record. In particular, the district court refused to credit Wendy's statement to Investigator Jones that she saw a woman resembling Keshia alive between 12:30 and 12:45 p.m. and the Roberts's and Waterman's statements that they heard sounds resembling gunshots after 1:00 p.m. The district court reasoned that crediting these statements would require accepting them "over the word of people who claim to have seen the petitioner either at or leaving the crime scene with a gun" before 12:44 p.m. *Juniper*, 2013 WL 1333513, at *18. But in determining whether a petitioner is entitled to relief under Section 2254 based on undisclosed exculpatory evidence, "credibility should be assessed on the basis of an in-court hearing where the judge can see and hear the witnesses." *Williams*, 623 F.3d at 1266; *Wolfe I*, 565 F.3d at 170 (holding that district court applied improper legal standard in denying habeas petitioner's request for evidentiary hearing when it found affidavit attached to complaint "not credible").

26

Viewing the withheld Roberts evidence in the light most favorable to Petitioner, disregarding the testimony by Rashid, Mings, and Murray subject to impeachment by the Roberts evidence, and resolving all credibility determinations in Petitioner's favor—as we must in determining whether Petitioner is entitled to an evidentiary hearing—the *only* fact on which the district court properly relied in concluding that the withheld Roberts evidence was not material is the knife handle and blade bearing Petitioner's DNA and thumbprint, respectively. Accordingly, we must determine whether the exculpatory value of the withheld Roberts materials, when evaluated relative to the inculpatory value of the knife blade and handle, would "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435; *see also Smith*, 572 F.3d at 1347 ("Once the evidence on the scales is adjusted to take into account the combined force and effect of the undisclosed evidence favorable to the defense, the standard that is applied is . . . whether what is left on both sides of the scale after adjusting for the withheld evidence creates a reasonable probability that a jury would acquit, and a reasonable probability is one sufficient to undermine our confidence in the guilty verdict.").

To be sure, the knife handle and blade provided strong evidence of Petitioner's guilt. *See Strickler*, 527 U.S. at 293 (holding withheld impeachment evidence not material when "there was considerable forensic and other physical evidence linking petitioner to the crime"). But the forensic evidence did not uniformly inculpate Petitioner. Most significantly, although the forensic evidence linked Petitioner to the knife used to stab Keshia, it did not link Petitioner to the gun used to kill Keshia and the other three victims. On the contrary, law enforcement officers never recovered the gun, and could not identify

any prints of value on the cartridges or cartridge casings. Indeed, the *only* forensic evidence related to the gun—the unidentified print of value on the ammunition box—did not point to Petitioner as the triggerman. Because the prosecution did not introduce any forensic evidence linking Petitioner to the gun, no forensic evidence directly linked Petitioner to the murders of the three victims who were not stabbed.[8] Likewise, although Petitioner's DNA appeared on a cigarette butt at the threshold of Keshia's apartment, a cigarette butt on the bed adjacent to the victims bore the DNA of an unidentified individual. And given Petitioner's admitted frequent presence in Keshia's apartment, including on the morning of the murders, finding Petitioner's DNA on items in and around the apartment does not irrefutably prove he committed the murders.

Whereas the forensic evidence inculpating Petitioner was strong, but not unassailable, the withheld Roberts materials—viewed in the light most favorable to Petitioner—had significant exculpatory value. First, Wendy's statement to the investigators and identification of a different individual in the photo array would have allowed Petitioner to mount an "other suspect" defense. Courts have long recognized that "new evidence suggesting an alternate perpetrator is 'classic *Brady* material.'" *Williams*, 623 F.3d at 1265 (9th Cir. 2010) (quoting *Boyette v. Lefevre*, 246 F.3d 76, 91 (2d Cir. 2001)); *Hart*, 798 F.3d at 588 n.1. To that end, courts have found withheld evidence

---

[8] Testimony by Rashid, Murray, and Mings placed a firearm in Petitioner's hands at the crime scene. However, as the district court recognized, that testimony is subject to impeachment by the withheld Roberts materials, *Juniper*, 2013 WL 1333513, at *14, and therefore is not properly considered when determining whether Petitioner is entitled to an evidentiary hearing.

material when the evidence pointed to a different individual as perpetrating the convicted offense. For example, in *Clemmons v. Delo*, 124 F.3d 944 (8th Cir. 1997), the Eighth Circuit concluded that an inter-office investigative report in which an investigator stated that a witness had identified another individual as perpetrating the crime was material. *Id.* at 947, 950–53; *see also Kyles*, 514 U.S. at 441–42 (holding withheld statements of witnesses material when statements described perpetrator who did not resemble defendant); *Dennis v. Sec'y, Penn. Dep't of Corr.*, 834 F.3d 263, 302 (3d Cir. 2016) (en banc) (holding withheld investigative statement that eyewitness had identified perpetrator as attending different school than defendant was material); *Castleberry v. Brigano*, 349 F.3d 286, 295 (6th Cir. 2003) (holding withheld statement by victim describing assailant that differed in appearance from defendant material); *United States v. Curry*, 57 F.3d 1071, 1995 WL 331471, at *1 (6th Cir. 1995) (table) ("Goen's statement that directly contradicts Robinson's identification raises a reasonable doubt concerning the defendant's possession of the stolen firearms. It is material in that it identifies another individual in possession of the guns[.]"); *Floyd v. State*, 902 So.2d 775, 784–85 (Fla. 2005) (holding statement by witness identifying other perpetrators of crime material).

Second, by establishing that Keshia was alive between 12:30 and 12:45 p.m., Wendy's statement to Investigator Jones, if proven credible, would call into question the government's theory that the murders occurred at 11:44 a.m. And when coupled with Waterman's statement, the Roberts's statements indicate that the murders occurred after 2:00 p.m., when Petitioner had already left Keshia's apartment. Courts have found withheld evidence material when the evidence undermined the government's theory as to

29

when a petitioner committed a crime. *Dennis*, 834 F.3d at 295-96 (holding that time-stamped receipt calling into question eyewitness's testimony that the petitioner was in the vicinity of the crime scene at the time of the crime was material because it "would have necessarily bolstered [the petitioner's] alibi defense narrative and 'put the whole case . . . in a different light'"); *Bies v. Sheldon*, 775 F.3d 386, 401 (6th Cir. 2014) ("The undisclosed contradictory evidence suggesting that [the victim] was in fact alive much later in the evening could have been used by the defense to disrupt the State's timeline and narrative of the crime."); *D'Ambrosio v. Bagley*, 527 F.3d 489, 498–99 (6th Cir. 2008) (holding that police report stating that witness saw victim alive "the night after" the alleged murder was, in conjunction with other withheld evidence, material).

Third, the withheld evidence "would have raised opportunities to attack . . . the thoroughness and even the good faith of the investigation." *Kyles*, 514 U.S. at 445 (concluding withheld evidence describing potential alternative perpetrator was material, in part because it could have been used to cast doubt on adequacy of government's consideration of alternative suspects). Had Petitioner's attorneys known that Wendy identified an alternative perpetrator, they could have raised doubts about the thoroughness of the investigation by questioning whether the police adequately pursued that alternative suspect, and if they did not, why they did not. *See Dennis*, 834 F.3d at 302 (explaining that had defendant received withheld evidence of witness's inconsistent statements to police, "defense counsel could have highlighted the investigatory failures for the jury"); *Bies*, 775 F.3d at 401 (finding withheld evidence that witnesses identified alternative perpetrators material because, in part, defense could have pointed to government's failure to pursue

30

alternative suspects as evidence that "the 'investigation [w]as shoddy'" (quoting *Kyles*, 514 U.S. at 445)).

Fourth, the withheld evidence was not cumulative of other evidence. *Cf. Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013) ("Suppressed evidence that would be cumulative of other evidence . . . is generally not considered material for *Brady* purposes."). On the contrary, Petitioner lacked any factual basis to assert an alternative perpetrator defense at trial. Likewise, the Roberts's statements provided new avenues for impeaching the prosecution's key witnesses. For example, Wendy's statement that Keshia was still alive at 12:30 p.m. directly undermined Rashid's, Murray's, and Mings's testimony that the murder occurred at 11:45 p.m. To be sure, Petitioner had already impeached Rashid, Murray, and Mings on other grounds, but this new line of impeachment, based on statements by allegedly disinterested witnesses, would have cast their testimony in a different light by "seriously undermin[ing] the testimony of . . . key witness[es]." *Id.*; *see also Dennis*, 834 F.3d at 300 ("[W]e have granted habeas relief on the basis of a 'significant difference' between the suppressed impeachment and other types of impeachment evidence used at trial."); *United States v. Wilson*, 481 F.3d 475, 480–81 (7th Cir. 2007) (explaining that "evidence that provides a new basis for impeachment is not cumulative and could well be material" and finding that withheld evidence providing new basis for impeachment of key witness was material).

Finally, Petitioner's trial counsel could have used the investigative notes of the Roberts's statements to pursue evidence of Petitioner's innocence that could have been used at trial. For example, had they known of the Roberts's statements and Wendy's

31

identification of an alternative perpetrator, they could have interviewed the Roberts and searched for the individual Wendy reported seeing in repeated arguments with Keshia, including after the murders allegedly occurred. *See Williams*, 623 F.3d at 1268 (holding withheld exculpatory evidence material when evidence could have "le[]d to evidence material to [the petitioner's] culpability").

In light of the foregoing, we do not believe the inculpatory value of the knife handle and blade is so great as to preclude the Roberts evidence, if found to be sufficiently credible during an evidentiary hearing, from "put[ting] the whole case in such a different light as to undermine confidence in the verdict." *Kyle*, 514 U.S. at 435. Accordingly, the district court abused its discretion in dismissing Petitioner's *Brady* claim premised on the withheld Roberts materials without holding an evidentiary hearing. *See Burgess v. Comm'r, Ala. Dep't of Corr.*, 723 F.3d 1308, 1320 (11th Cir. 2013) (holding that a district court abuses its discretion in denying a habeas petitioner an evidentiary hearing "where 'such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief.'" (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007))); *Murphy v. Johnson*, 205 F.3d 809, 816 (5th Cir. 2000) ("To find an abuse of discretion that would entitle Murphy to an evidentiary hearing, we must find that the state did not provide him with a full and fair hearing and we must be convinced that if proven true, his allegations would entitle him to relief."); *cf. Walker v. True*, 399 F.3d 315, 327 (4th Cir. 2005) (explaining that *Townsend* holds that "[w]here the facts are in dispute, the federal court in habeas corpus *must hold an evidentiary hearing* if the habeas applicant did not receive a full and fair evidentiary hearing in a state court" (some emphasis removed)).

That we conclude the district court erred in denying Petitioner's request for an evidentiary hearing does not mean that Petitioner's *Brady* claim premised on the withheld Roberts materials will ultimately succeed. After having the opportunity to assess the credibility of the relevant witnesses, the district court may conclude that the Roberts's recollections of the events surrounding the murders are not sufficiently credible; are sufficiently distinguishable from Rashid's, Mings's, and Murray's testimony as to be non-impeaching; or otherwise fail to "put the whole case in such a different light as to undermine the confidence in the verdict." *Kyle*, 514 U.S. at 435. Likewise, the district court may conclude, after receiving evidence from the parties, that the withheld Roberts materials would not have "le[]d to evidence material to [Petitioner's] culpability." *Williams*, 623 F.3d at 1268. And the district court may conclude, after receiving testimony from Deputy Commonwealth's Attorney Evans, Detective Conway, and other state officials, that notwithstanding the prosecution's troubling disregard of its obligations under *Brady*, the prosecution did not withhold other evidence related to or supporting the Roberts statements warranting further investigation. But those determinations should not—and cannot—be made in the absence of an evidentiary hearing.[9]

---

[9] Petitioner also seeks the opportunity for "fuller development of the evidence," Appellant's Br. at 20, which we construe as a request to conduct additional discovery on his *Brady* claim. Under Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Court, a district court may authorize discovery upon a showing of "good cause" by a petitioner. "'[G]ood cause' will exist when 'specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'" *Wolfe I*, 565 F.3d at 165 n.36 (2009) (quoting *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997)). On remand, the district court may consider whether the withheld exculpatory and impeaching evidence produced as a

### III.

Without question, the perpetrator of the Stephens's murders committed a heinous crime and should be vigorously pursued and prosecuted. However, the prosecution's pursuit of justice must keep faith with the principles of due process that separate societies that adhere to the rule of law from those that do not. The withheld Roberts materials were exculpatory and "impeaching evidence that was unquestionably subject to disclosure under *Brady*." *Wolfe II*, 691 F.3d at 423 (internal quotation omitted). By failing to disclose such evidence before trial—and unjustifiably continuing to resist its disclosure for years thereafter—"the prosecution arrogated to itself a central function belonging to the criminal jury and pursued its role as adversary to the exclusion of its role as architect of a just trial." *United States v. Jernigan*, 492 F.3d 1050, 1056–57 (9th Cir. 2007). In such circumstances—and in light of the conflicting and unresolved facts bearing on the materiality of the Roberts materials—the district court should not have disposed of Petitioner's *Brady* claim without holding an evidentiary hearing.

*VACATED, IN PART, AND REMANDED*

---

result of its limited grant of discovery, coupled with Deputy Commonwealth Attorney Evans's and Detective Conway's affidavits and any evidence adduced during the evidentiary hearing, warrant authorizing additional discovery. The district court also, of course, may reconsider its previous rulings on any related issues.